J-S38014-21

2022 PA Super 81

KATHYRN A. CONSTANTAKIS : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
v. :
:
:
:
BRYAN ADVISORY SERVICES, LLC :
AND RICHARD G. BRYAN :
:
: No. 533 WDA 2021
Appellants :
:
WILLIAM VESCIO AND BRYAN :
VESCIO :
v. :
:
:
:
BRYAN ADVISORY SERVICES, LLC :
AND RICHARD G. BRYAN :
:
Appellants :

Appeal from the Order Entered April 21, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-21-001965,
GD-21-002478

KATHYRN A. CONSTANTAKIS : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
BRYAN ADVISORY SERVICES, LLC :
AND RICHARD G. BRYAN :
:
: No. 1034 WDA 2021
Appellants :
:
WILLIAM VESCIO AND BRYAN :
VESCIO :
v. :
:
:
:

BRYAN ADVISORY SERVICES, LLC  :
AND RICHARD G. BRYAN  :
  :
Appellants

Appeal from the Order Entered April 21, 2021
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-21-001965,
GD-21-002478

BEFORE:   BENDER, P.J.E., DUBOW, J., and COLINS, J.[*]

OPINION BY BENDER, P.J.E.:                               **FILED: MAY 5, 2022**

Richard G. Bryan ("Mr. Bryan") and Bryan Advisory Services, LLC ("BAS") (collectively "Appellants") appeal from the orders entered by the Court of Common Pleas of Allegheny County on April 21, 2021, granting the requests for emergency special relief in the form of preliminary injunctions filed by Kathryn A. Constantakis and Bryan Vescio (collectively "Appellees"). After careful review, we affirm in part, reverse in part, and remand with instructions.[1]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] On March 18, 2022, Faegre Drinker Biddle & Reath LLP ("Faegre Drinker") filed a petition to withdraw as counsel for Appellants, which was deferred to this panel. Faegre Drinker assures that good cause exists for the filing of its petition pursuant to Pennsylvania Rule of Professional Conduct 1.16(b)(5)-(6). **See** Pa. Rule of Prof. Conduct 1.16(b)(5), (6) (providing that "a lawyer may withdraw from representing a client if … the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled[,]" or if "the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client"). We remand this petition for consideration by the trial court.

The trial court summarized the relevant factual and procedural background of these matters in its Pa.R.A.P. 1925(a) opinion, as follows:

## I. The Parties

[BAS] is a limited liability company dually incorporated under the laws of the Commonwealth of Pennsylvania, with a registered business address at 125 Technology Drive, Suite 105, Canonsburg, Washington County, Pennsylvania 15057. Mr. Bryan is President and Chief Compliance Officer of Bryan Funding, Inc., which is under common control with BAS, and both are owned by Mr. Bryan.

… Kathryn A. Constantakis ("Ms. Constantakis"), William Vescio and Bryan Vescio[] are all associated through Vescio Asset Management, LLC ("VAM"), a limited liability company located at Waterfront II Office Building, 2100 Georgetown Drive, Suite 304, Sewickley, [Pennsylvania] 15243. Ms. Constantakis is an Investment Adviser Representative ("IAR"). She has been employed with VAM since October 2012[,] in her role as a Senior Portfolio Manager. William Vescio is the sole owner and managing member of VAM. Bryan Vescio is the Vice President of Operations and Investment Manager at VAM, and the son of William Vescio.

## II. Factual and Procedural Background

VAM is currently identified as a branch office of Bryan Funding, Inc. From approximately August 2010 until January 2021, VAM provided investment management services to clients through BAS, an [*sic*] Securities Exchange Commission ("SEC")-Registered Investment Adviser ("RIA"). As the RIA under which VAM operated, BAS provided VAM with compliance services, including receiving payments from VAM clients and monitoring VAM emails under bryanfunding.com. Other than its supervisory responsibilities, BAS was not involved in the day-to-day investment management services that VAM provides.

Ms. Constantakis is the Senior Portfolio Manager at VAM, and as a condition of her employment, BAS directed Ms. Constantakis to register with [the] Financial Industry Regulatory Authority

("FINRA") as a broker.[2]  Ms. Constantakis thereafter registered with FINRA as a broker from April 2016 through November 2019[,] until Bryan Funding, Inc. terminated its registration as a broker-dealer and the registration of Ms. Constantakis as a broker.  As noted above, William Vescio is the sole owner and managing member of VAM, and Bryan Vescio is the Vice President of Operations and Investment Manager at VAM.

In approximately December [of] 2020, VAM applied for registration as an RIA.  VAM intended to establish itself as a new advisory firm separate and independent from BAS.  In tandem with that process, the administrative assistant of VAM created new firm letterhead, e-mail addresses, and prototype invoices in anticipation of its eventual registration so that all invoices would be ready for finalization when VAM received its SEC registration.  VAM's administrative assistant sent the prototype invoices for review using the BAS interoffice e-mail.  Mr. Bryan was able to access and view the prototypes in the email.  Upon seeing the protype [sic] invoices, Mr. Bryan and BAS were alarmed, and subsequently conducted a physical audit of VAM's office.  According to Mr. Bryan, if those invoices had actually been sent to BAS clients, BAS clients would have been defrauded into diverting fees to VAM that were contractually owed to BAS.

On or about January 13, 2021, Appellees learned that Mr. Bryan filed [Uniform Termination Notices for Securities Industry Registration ("Form U5")3] accusing William Vescio, Bryan Vescio, and Ms. Constantakis of unspecified SEC violations.  The Form U5s contain allegations that William Vescio, Bryan Vescio, and Ms. Constantakis actually sent out the protype [sic] invoices with intent to defraud clients.  Mr. Bryan also filed an Investment

---

[2] "FINRA is responsible for regulatory oversight of all securities firms that do business with the public[] and has the power to initiate a disciplinary proceeding against any FINRA member for violating any FINRA rule." **NASDAQ OMX PHLX, Inc. v. PennMont Secs.**, 52 A.3d 296, 310 (Pa. Super. 2012) (internal citation, quotation marks, and ellipses omitted).

[3] FINRA requires the use of Form U5 to update the Investment Adviser Registration Depository ("IARD"), "an electronic filing system for investment advisers sponsored by the SEC and [the] North American Securities Administrators Association ('NASAA')," regarding the termination of IARs and the reason for their termination.  Appellants' Brief, 10/1/21, at 5-6 (citations omitted).

Adviser Public Disclosure ("IAPD") concerning Ms. Constantakis. The IAPD explains that a termination is disclosed when the IAR was discharged after allegations were made that accused the IAR "of violating investment-related statutes, regulations, rules or industry standards of conduct; fraud or the wrongful taking of property…." The IAPD which Mr. Bryan filed for Ms. Constantakis contains essentially the same allegations as the Form U5s. Like the Form U5, the IAPD is publicly available.

BAS and Mr. Bryan blocked VAM's ability to access any of its client accounts and left VAM without a platform on which to operate, effectively halting the ability of Appellees to provide direct financial services and fulfill fiduciary obligations to clients. Additionally, BAS and Mr. Bryan wrote letters to VAM's clients informing them that it had terminated the employment of William Vescio, Bryan Vescio and Ms. Constantakis. On or about January 21, 2021, VAM finalized its registration with the SEC as an investment adviser.

On March 8, 2021, William and Bryan Vescio filed a complaint at GD[-]21-001965, which alleged breach of contract, tortious interference with contractual relations, and defamation. Then, on March 17, 2021, Ms. Constantakis filed a complaint at GD[-]21-002478, which also alleged a count of tortious interference with contractual relations and another count of defamation. Both complaints name [BAS] and [Mr.] Bryan as defendants.

Appellees maintain that, as a result of the allegations in the Form U5s and the IAPD, Appellants are (1) interfering with current and potential future contractual relations with clients; (2) interfering with Appellees' ability to obtain IAR registration with VAM or another RIA; (3) interfering with the ability of Appellees to be approved by an investment management platform to service such clients; (4) interfering with Appellees' ability to obtain employment (presently or in the future) that requires FINRA or IAR registration or approval; and (5) generally interfering with Appellees' professional reputation in a manner that does, and will, interfere with their ability to be employed.

On March 31, 2021, this court consolidated the actions at GD[-]21-001965 and GD[-]21-002478, and assigned them upon

motion to the Commerce and Complex Litigation Center.[4] Thereafter, this court held a multi-day evidentiary hearing on Appellees' motions for special injunctive relief. During the hearing, despite having several months to investigate the allegations contained in the Form U5s and the IAPD, this court found that Appellants failed to present any evidence that Bryan Vescio or Ms. Constantakis violated any investment-related statutes, regulations, rules, and/or industry standards of conduct. Additionally, this court found that, even if the VAM prototype invoices were sent out to BAS clients prior to the filing of the Form U5s and IAPD report, Appellants failed to demonstrate that Bryan Vescio or Ms. Constantakis had anything to do with the alleged event. Beyond valuing accounts and verifying fee calculations, Bryan Vescio demonstrated that he had no involvement in creating or sending invoices to clients: [H]e never saw them and did not have authority to prepare or transmit them. Similarly, Ms. Constantakis demonstrated that she never created, sent, or collected invoices in the name of VAM. Finally, Mr. Bryan's text messages demonstrate that he was willing to amend the Form U5s so long as the parties came to an agreement, and Mr. Bryan could somehow recapture William Vescio's and VAM's clients.

On April 21, 2021, following the conclusion of the multi-day hearing, this court granted Ms. Constantakis'[s] and Bryan

_____

[4] Although the trial court purported to consolidate Appellees' two separate cases, complete consolidation could not have occurred because there is no complete identity of parties in these cases. *See Malanchuk v. Tsimura*, 137 A.3d 1283, 1288 (Pa. 2016) ("[C]omplete consolidation (or merger or fusion of actions) does not occur absent a complete identity of parties and claims; separate actions lacking such overlap retain their separate identities and require distinct judgments; these principles pertain equally to appealability determinations; and they continue to operate even in the face of an order purporting to consolidate the actions 'for all purposes.'"); *Azinger v. Pennsylvania R. Co.*, 105 A. 87, 88 (Pa. 1918) ("Where separate actions in favor of or against two or more persons have arisen out of a single transaction, and the evidence by which they are supported is largely the same, although the rights and liabilities of parties may differ, it is within the discretion of the trial judge to order all to be tried together, though in every other respect the actions remain distinct and require separate verdicts and judgments."). Thus, we conclude the trial court properly exercised its discretion in consolidating these two matters for administrative convenience, but because the parties are not identical, the consolidation order does not supplant the requirement for the entry of separate judgments in each case.

Vescio's requests for injunctive relief. The injunctions enjoined Appellants from making false, unsubstantiated, and defamatory statements about Ms. Constantakis and Bryan Vescio. This court further ordered that the defamatory language in the Form U5s and IAPD be expunged, and required Appellants to file neutral, amended Form U5s for Ms. Constantakis and Bryan Vescio, as well as a neutral, amended IAPD for Ms. Constantakis.[5]

On April 29, 2021, Appellants appealed to the Superior Court of Pennsylvania from the [Injunction Orders].[6] On May 17, 2021, Appellants filed their Statement of Errors Complained of on Appeal.

Trial Court Opinion ("TCO"), 8/17/21, at 1-5 (unnecessary capitalization and footnote omitted).

On July 16, 2021, this Court directed Appellants to show cause as to why this appeal should not be quashed in whole or in part as to the claims stemming from GD-21-001965, where no notice of appeal was filed on that

---

[5] The trial court entered three separate orders dated April 21, 2021, granting relief with respect to each plaintiff. The orders as to William Vescio and Bryan Vescio were entered on both dockets. The order as to Ms. Constantakis was only entered at GD-21-002478. The order regarding William Vescio is not at issue in this appeal. We further note that the orders regarding Bryan Vescio and Ms. Constantakis ("the Injunction Orders") contain almost identical language, granting Appellees' motions for emergency special relief, enjoining Appellants "from making false, unsubstantiated, and defamatory statements" about Appellees, and requiring Appellants to replace the "defamatory language" in the Form U5s with "neutral, amended Form U5[s] … in accordance with Schedule A" attached to the orders, except that the order pertaining to Ms. Constantakis also requires Appellants to file a neutral, amended IAPD.

[6] Appellants filed only one notice of appeal at GD-21-002478, which was docketed by this Court at 533 WDA 2021. The notice includes both trial court docket numbers and purports to appeal from the orders pertaining to both Bryan Vescio and Ms. Constantakis. The notice further indicates that it was filed at GD-21-002478 "pursuant to the consolidation order of the Court of Common Pleas and the instructions of the Department of Court Records." **See** Appellants' Notice of Appeal, 4/29/21, at 1.

docket, for failure to comply with Pennsylvania Rule of Appellate Procedure 341(a) and its Note. **See** *Per Curiam* Order ("Rule to Show Cause"), 7/16/21 (single page) (citing Pa.R.A.P. 341, Official Note ("Where … one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeals must be filed."); **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) (confirming that failure to comply with Rule 341(a) and its Note shall result in quashal of the appeal)).[7, 8]

In response, Appellants averred that the trial court and the parties have treated these matters as one case from the beginning. **See** Appellants'

---

[7] Since the issuance of the Rule to Show Cause, our Supreme Court has expressly overruled the statements in its **Walker** opinion that indicate the failure to file separate appeals in compliance with Rule 341(a) "**requires** the appellate court to quash the appeal." **Commonwealth v. Young**, 265 A.3d 462, 477 n.19 (Pa. 2021) (emphasis in original). The **Young** Court clarified: "Rule 341 requires that when a single order resolves issues arising on more than one docket, separate notices of appeal must be filed from that order at each docket; but, where a timely appeal is erroneously filed at only one docket, Rule 902 permits the appellate court, in its discretion, to allow correction of the error, where appropriate." **Id.** at 477.

[8] In the Rule to Show Cause, we acknowledged our Supreme Court's recent clarification that "filing a single notice of appeal from a single order entered at the lead docket number for 'consolidated civil matters where all record information necessary to adjudication of the appeal exists, and which involves identical parties, claims and issues, does not run afoul of **Walker**, Rule 341, or its Official Note.'" Rule to Show Cause (single page) (quoting **Always Busy Consulting, LLC v. Babford & Company, Inc.**, 247 A.3d 1033, 1043 (Pa. 2021)). Moreover, we noted, "it does not appear that these cases involve identical parties, claims and issues." **Id.**

Response to Rule to Show Cause, 7/28/21, at 1-2 (unpaginated).[9]  In fact,

Appellants state that "less than a month after the complaints were filed, the

[c]ourt directed the cases to be consolidated (not coordinated or otherwise

administratively linked), and GD-21-002478 was designated as the lead

docket."  *Id.* at 1 (unpaginated).[10]  Importantly, Appellants noted that,

following consolidation but prior to the entry of the orders from which they

appeal, the Allegheny County Department of Court Records rejected their

attempted filings at the secondary docket of GD-21-001965.  ***See id.*** at

Exhibit E ("Rejection Notice") (indicating that the case had been consolidated

at GD-21-002478 and informing Appellants' counsel that his attempted filing

at GD-21-001965 was rejected because "once a case is consolidated, the

pleadings must only be filed at the lead case number").  Moreover, Appellants'

counsel indicated that he contacted the Department of Court Records in

preparation for the filing of Appellants' notice(s) of appeal and was instructed

_____

[9] Appellants explained, "the Plaintiffs at both dockets brought the same
challenges to the same alleged conduct of the same Defendants-Appellants."
*Id.* at 1 (unpaginated).  "The allegations arise out of the same series of
events…. [T]he parties are pursuing the same causes of action, and the court
filings have been mirrored in both actions." *Id.*

[10] We observe that some confusion was created by the trial court's
"consolidation" of these cases.  Following entry of the consolidation order on
each docket, some documents were filed at only GD-21-001965, some only at
GD-21-002478, and others were filed at both dockets.  Although not explicitly
stated in its order, it does appear that the trial court intended to designate
GD-21-002478 as the lead case.  ***See*** Docket No. GD-21-001965 at 1
(reflecting the following notation in the upper righthand corner: "Case
Consolidated at GD-21-002478[.]").

to file only a single notice at GD-21-002478, the lead case number. *Id.* at 2 (unpaginated). Hence, Appellants requested that we not quash their appeal, as they "acted in accordance with the information received from the Department of Court Records and within the physical constraint of being able to file only on docket GD-21-002478." *Id.* (citing *Always Busy Consulting, LLC*, 247 A.3d at 1042 (concluding that where the appellant's attempt to file separate notices of appeal at separate docket numbers was rejected by the court on the basis that all filings must be made at the lead docket number in consolidated matters, such circumstances constitute "a breakdown in court operations that ordinarily would preclude quashal")).

Based on Appellants' response, this Court discharged the rule to show cause and referred the issue to this panel. *Per Curiam* Order, 9/2/21 (single page). The discharge order further directed the trial court prothonotary "to enter the notice of appeal filed at GD-21-002478 on the docket for GD-21-001965[,] on or before September 15, 2021." *Id.* The trial court prothonotary complied. Upon receipt of the notice of appeal docketed at GD-21-001965, this Court assigned that appeal a separate docket number (1034 WDA 2021). We then consolidated the appeals at 533 and 1034 WDA 2021 by *per curiam* order dated September 27, 2021. *See* Pa.R.A.P. 513 ("[W]here the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").

- 10 -

We now consider whether Rule 341(a) and *Walker* require quashal of this appeal. While we agree with Appellants that a breakdown in court operations occurred here,[11] Appellants have failed to convince us the exception to *Walker* established in *Always Busy Consulting, LLC*, extends to this matter where there is no complete identity of parties and, thus, no consolidation of the underlying cases. *See Young*, 265 A.3d at 464-65 (concluding the exception to the *Walker* rule enunciated in *Always Busy Consulting, LLC*, "is not broad enough to encompass the present matter[,]" where the appeal arises from the prosecution of two defendants proceeding at multiple docket numbers for each defendant and where the trial court consolidated the docket numbers for trial purposes only);[12] *Always Busy Consulting, LLC*, 247 A.3d at 1043 (distinguishing consolidated cases involving complete identity of parties and claims from *Walker*); *Malanchuk*, 137 A.3d at 1288 (requiring complete identity of parties and claims for true consolidation of cases).

---

[11] *See Always Busy Consulting*, *LLC*, *supra*; *Commonwealth v. Stansbury*, 219 A.3d 157, 160 (Pa. Super. 2019) (concluding that misstatements by the PCRA court as to the manner the appellant could effectuate an appeal from the PCRA court's order amounted to "a breakdown in court operations").

[12] The *Young* Court emphasized that "parties are not permitted unilaterally to consolidate matters for appellate review by filing a single notice of appeal from an order arising on multiple dockets…. [C]onsolidation is a determination that must be made by the appellate court, at its discretion, absent a stipulation by all parties to the several appeals." *Young*, 265 A.3d at 474 (citing *Always Busy Consulting, LLC*, 247 A.3d at 1042).

- 11 -

Nevertheless, the **Young** Court stated, "there is another rule with a role to play in matters like this one: Pa.R.A.P. 902 (manner of taking appeal)." **Young**, 265 A.3d at 475. Rule 902 provides:

> Failure of an appellant to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but it is subject to such action as the appellate court deems appropriate, which may include, but is not limited to, remand of the matter to the lower court so that the omitted procedural step may be taken.

Pa.R.A.P. 902. The rule was revised in 1986 to reflect a change in approach to formal defects. **See id.** at Note ("The reference to dismissal of the appeal has been deleted in favor of a preference toward[] remanding the matter to the lower court so that the omitted procedural step may be taken, thereby enabling the appellate court to reach the merits of the appeal.").

In considering the Commonwealth's request for an opportunity to amend its notice of appeal to include a separate notice for each lower court number in compliance with **Walker**, the **Young** Court acknowledged that "nothing practical is achieved by the reflexive quashal of appeals for easily corrected, non-jurisdictional defects. Indeed, Rule 902 is designed specifically to eliminate such quashals as it eliminates the 'trap' of failure to perfect an appeal by making timely notices of appeal 'self-perfecting.'" **Young**, 265 A.3d at 477 (citing Pa.R.A.P. 902, Note; some internal quotation marks omitted). The Court further opined:

> We realize permitting parties to rectify non-jurisdictional procedural missteps relating to notices of appeal will, for all practical purposes, largely blunt the bright-line rule the **Walker** Court sought to impose with respect to Rule 341(a). However, as

- 12 -

we also expressly noted in **Walker**, "[p]rocedural rules should be construed to give effect to all their provisions, and a single rule should not be read in a vacuum, especially where there is a relationship between different rules."

**Id.** at 477 (quoting **Walker**, 185 A.3d at 976 (citations omitted)).

Moreover, this Court has established that we may overlook the requirements of **Walker** where a breakdown occurs in the court system and a defendant was misinformed or misled regarding his appellate rights. **See Commonwealth v. Larkin**, 235 A.3d 350, 354 (Pa. Super. 2020); **see also Commonwealth v. Stansbury**, 219 A.3d 157, 160 (Pa. Super. 2019) ("We have many times declined to quash an appeal when the defect resulted from an appellant's acting in accordance with misinformation relayed to him by the trial court.").

In light of **Young** and having determined that Appellants' failure to file a separate notice of appeal at GD-21-001965 in compliance with Rule 341(a) was the result of a breakdown in court operations, we decline to quash this appeal. Additionally, because the trial court has already complied with this Court's directions to correct the procedural missteps regarding Appellants' appeal from the order entered at GD-21-001965, we need not remand for the filing of amended notices of appeal or other corrective action and, thus, we proceed with addressing the merits of Appellants' claims.

Herein, Appellants present the following issues for our review:

1. Did the [trial court] err by granting preliminary injunctions for alleged defamation in contravention of Art. I, § 7 of the Pennsylvania Constitution and the First Amendment of the Constitution of the United States?

- 13 -

2. Did the [trial court] err when it ordered … [BAS] to file amended Form[] U5[s] that contain objectively false statements, even according to Ms. Constantakis'[s] and [Bryan] Vescio's pleadings, where those filings would subject BAS to potential regulatory consequences?

3. Did the [trial court] err by finding that Ms. Constantakis and [Bryan] Vescio satisfied the requirements for a mandatory preliminary injunction under **Summit Towne Centre[, Inc.] v. Shoe Show of Rocky Mount, Inc[.]**, 828 A.2d 995 (Pa. 2003)[,] and **Big Bass Community Association v. Warren**, 950 A.2d 1137 (Pa. Cmwlth. 2008)?

Appellants' Brief at 4.

## I.    Constitutionality of Injunction Orders

We first examine Appellants' claim regarding the constitutionality of the Injunction Orders entered against them by the trial court.  As Appellants' challenge presents questions of law, our standard of review is *de novo* and our scope of review is plenary.  **S.B. v. S.S.**, 243 A.3d 90, 104 (Pa. 2020) (citing **Gentile v. State Bar of Nevada**, 501 U.S. 1030, 1038 (1991) (acknowledging that where First Amendment issues are raised, "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression") (internal quotation marks and citation omitted)).

Preliminarily, we note Article I of the Pennsylvania Constitution consists of the Pennsylvania Declaration of Rights, which affirms that all citizens "have certain inherent and indefeasible rights[.]"  Pa. Const. Art. I, § 1.  Among those inherent rights are those delineated in Section 7, which addresses "Freedom of press and speech; libels[,]" and provides:

> The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

Pa. Const. Art. I, § 7.[13]  In comparison, the text of the First Amendment of the federal Constitution provides, in relevant part, that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press…."  U.S. Const. Amend. I.  "It is well settled that a state may provide through its constitution a basis for the rights and liberties of its citizens independent from that provided by the [f]ederal Constitution, and that the rights so guaranteed may be more expansive than their federal counterparts."  ***Commonwealth v. Tate***, 432 A.2d 1382, 1387 (Pa. 1981).  Because our Supreme Court has long recognized Article I, Section 7 as providing broader freedom of expression than the federal Constitution, we focus our analysis herein on the Pennsylvania Constitution.  ***See Pap's A.M. v. City of Erie***, 812 A.2d 591, 603 (Pa. 2002);

---

[13] The last sentence of Article I, Section 7, which is cited in part by Appellants *infra*, is omitted above, as it was declared contrary to the federal Constitution in ***Commonwealth v. Armao***, 286 A.2d 626 (Pa. 1972).  That sentence read:

> No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or formation, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; ***and in all indictments for libels the jury shall have the right to determine the law and the facts, under the discretion of the court, as in other cases***.

***Id.*** at 632 (emphasis added).

***Bureau of Professional and Occupational Affairs v. State Bd. of Physical Therapy***, 728 A.2d 340, 343-44 (Pa. 1999).

First, Appellants assert that the Injunction Orders, which enjoin them from making false, unsubstantiated, and defamatory statements about Appellees and direct them to file neutral, amended Form U5s and an amended IAPD, constitute "unconstitutional prior restraints under both the Pennsylvania and federal constitutions." Appellants' Brief at 27.[14] In support of their argument, Appellants cite a string of cases upholding the long-established prohibition of prior restraint on the exercise of an individual's right to freely communicate thoughts and opinions. ***See id.*** at 29-30 (citing, *inter alia*, ***Willing v. Mazzocone***, 393 A.2d 1155 (Pa. 1978); ***Franklin Chalfont Associates v. Kalikow***, 573 A.2d 550 (Pa. Super. 1990); ***Long v. 130 Market St. Gift & Novelty of Johnstown***, 440 A.2d 517 (Pa. Super. 1982)).

Appellants' argument relies heavily on ***Willing***, in which the Court emphasized that Article I, Section 7 is designed "[t]o prohibit the imposition of prior restraints upon the communications of thoughts and opinions, leaving the utterer liable only for an abuse of the privilege." ***Willing***, 393 A.2d at 1157 (quoting ***Goldman Theatres, Inc. v. Dana***, 173 A.2d 59, 62 (Pa. 1961)). As summarized by the trial court:

---

[14] We observe that while Appellants claim the trial court's granting of preliminary injunctive relief violated both the Pennsylvania and federal Constitutions, Appellants focus on Article I, Section 7 in the argument section of their brief.

In **Willing**, two lawyers, Carl M. Mazzocone and Charles F. Quinn ("the Lawyers"), filed a lawsuit against a former client, Helen Willing ("Ms. Willing"). [**Willing**, 393 A.2d] at 1156. The Lawyers previously assisted Ms. Willing with a workmen's compensation matter. Ms. Willing believed that the Lawyers engaged in misconduct while representing her. **Id.** In order to protest the Lawyers' alleged misconduct, Ms. Willing crafted a "sandwich-board" sign. **Id.** On the sign, Ms. Willing hand[-]lettered the following: LAW FIRM of QUINN MAZZOCONE Stole money from me and Sold-me-out-to-the INSURANCE COMPANY. **Id.** On two separate days, Ms. Willing wore the "sandwich-board" sign and demonstrated in public by marching back and forth along a well-traveled pedestrian walkway between two court buildings for several hours each day. **Id.** As she marched, Ms. Willing also pushed a shopping cart with an American flag on it, continuously rang a cow bell, and blew a whistle to attract as much attention as possible. **Id.** With their lawsuit, the Lawyers sought to enjoin Ms. Willing from engaging in further demonstration. **Id.**

The trial court held multiple hearings and ultimately concluded that Ms. Willing failed to present any evidence to support her misconduct allegations against the Lawyers. Accordingly, the trial court issued an injunction that precluded Ms. Willing from "further unlawful demonstration, picketing, carrying placards which contain defamatory and libelous statements and or uttering, publishing and declaring defamatory statements against … [the Lawyers]." **Id.** at 1157. The Superior Court affirmed the trial court's decision on appeal. **Id.** However, the Superior Court modified the injunction to read, "Helen R. Willing, be and is permanently enjoined from further demonstrating against and/or picketing Mazzocone and Quinn, Attorneys-at-Law, by uttering or publishing statements to the effect that Mazzocone and Quinn, Attorneys-at-Law stole money from her and sold her out to the insurance company." **Id.** The Supreme Court of Pennsylvania granted Ms. Willing's petition for allowance of appeal and reversed the lower courts' decisions.

In reversing the lower courts' decisions, the Supreme Court of Pennsylvania reasoned that Art. I, § 7 of the Pennsylvania Constitution is "intended to prohibit prior restraint on Pennsylvanians' right to speak." **Id.** The Court clarified that the lower courts' orders violated Pennsylvania's prohibition on prior restraints because the orders precluded Ms. Willing from speaking her opinion freely in the future. **Id.** at 1157-58. The Court explained that injunctive relief that prohibits future speech

violates the Pennsylvania Constitution, "regardless of whether that opinion is based on fact or fantasy regarding [the Lawyers'] professional integrity…." *Id.* at 1158.

TCO at 6-8 (capitalization in original).

In support of its granting of injunctive relief in the present matter, the trial court asserts that it "by no means aims to diminish the importance of Appellants' constitutional rights to freedom of speech[;]" however, it attempts to justify its decision by distinguishing this matter from *Willing*. *Id.* at 8. The trial court opined:

> First, unlike *Willing*, this court's injunctive orders do not involve prior restraints on speech.[15] In general, prior restraints on speech involve some kind of control over speech prior to any publication of the speech at issue. *See Times Film Corp. v. City of Chicago*, 365 U.S. 43, 45-46 (1961). Thus, a system of prior

---

[15] The trial court acknowledged that its injunctive orders are comprised of two aspects. The first portion of its orders enjoins Appellants from making false, unsubstantiated, and defamatory statements about Ms. Constantakis and Bryan Vescio. The second dictates that the defamatory language in the Form U5s and IAPD be expunged and requires Appellants to file neutral, amended Form U5s for Ms. Constantakis and Bryan Vescio, and a neutral, amended IAPD for Ms. Constantakis. *See id.* at 8 n.3. The trial court explained:

> The second aspect is the principal means of relief this [c]ourt determined is necessary in this case, as the current Form U5s and the IAPD effectively prevent Ms. Constantakis and Bryan Vescio from working in the investment industry entirely. This [c]ourt determined the second aspect is not a prior restraint for the reasons contained in this opinion. While this [c]ourt believes the first aspect of the injunction orders is merely an extension of the second aspect, to the extent that the first aspect of this [c]ourt's order could be considered a prior restraint on future speech, this [c]ourt invites the Superior Court to modify the order as it deems necessary.

*Id.*

- 18 -

restraint is one that would prevent the communication of speech from occurring in the first instance. *See id.* In **Willing**, the Supreme Court of Pennsylvania cited to Blackstone when it discussed the history of the Pennsylvania Constitution and the importance of Pennsylvania's prohibition on prior restraints. **See Willing**, 393 A.2d at 1157-58. Specifically, the Court cited the following passage from Blackstone:

> The liberty of the press is indeed essential to the nature of a free state; but, this consists of laying no previous restraints upon publications, **and not in freedom from censure for criminal matter when published**. Every freeman had an undoubted right to lay what sentiments he please before the public; to forbid this is to destroy the freedom of the press; **but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity**.

*Id.* at 1158 (emphasis added). The Court's reference to Blackstone demonstrates not only that prior restraints are essential to the nature of a free state, but also that post restraints are treated differently than prior restraints. *Id.* Notably, once speech has been published, the speech and/or the speaker are no longer immune from consequences, including censure. *Id.* Indeed, Art. I, § 7 of the Pennsylvania Constitution also makes this distinction clear, as it embodies Blackstone's commentary by providing that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, *being responsible for the abuse of that liberty*." Pa. Const. Art. I, § 7 (emphasis added).

Here, Appellants filed the Form U5s and the IAPD prior to this court's granting injunctive relief. Because Appellants[] already published the Form U5s and the IAPD, this court's orders are better categrized [*sic*] as post restraints on speech, rather than prior restraints. Here, this court issued the post restraints on speech, and required Appellants[] to amend and update the Form U5s and the IAPD with regard to Bryan Vescio and Ms. Constantakis, only after a multi-day evidentiary hearing, at which Appellants produced no evidence that Bryan Vescio or Ms. Constantakis violated any investment-related statutes, regulations, rules, and/or industry standards of conduct. This court found that, even if the VAM prototype invoices were sent out to BAS clients prior to the filing of the Form U5s and IAPD report (a fact which is still questionable)[,] Appellants failed to

demonstrate that Bryan Vescio or Ms. Constantakis had anything to do with that alleged event. Beyond valuing accounts and verifying fee calculations, Bryan Vescio demonstrated that he had no involvement in creating or sending invoices to clients: [H]e never saw them and did not have authority to prepare or transmit them. Similarly, Ms. Constantakis demonstrated that she never created, sent, or collected invoices in the name of VAM. Moreover, Mr. Bryan's text messages demonstrate that he was willing to amend the filings so long as the parties came to an agreement, and Mr. Bryan could somehow recapture William Vescio's and VAM's clients.

Based upon the evidence presented at the multi-day hearing, this court concluded that Appellants originally filed the Form U5s and IAPD relating to Bryan Vescio and Ms. Constantakis with reckless, and potentially malicious, allegations that, as far as this court could surmise, had no basis in fact whatsoever. Thus, this court's orders are, at most, merely post restraints on improper, mischievous, unprivileged, and unjustifiable speech. As the Supreme Court of Pennsylvania recognized in **Willing**, such consequences were explicitly contemplated by both Blackstone and Art. I, § 7 of the Pennsylvania Constitution.

*Id.* at 8-10 (unnecessary capitalization omitted).

We disagree with the trial court's categorizing the first aspect of its Injunction Orders as "post restraints." To the extent that the orders enjoin Appellants "from making false, unsubstantiated, and defamatory statements" about Appellees, we conclude that this language clearly restricts Appellants' future speech and, thus, comprises an unconstitutional prior restraint. **See Willing**, 393 A.2d at 1157 (concluding that the orders enjoining the appellant from further demonstrating and/or picketing were clearly prohibited by Article I, Section 7, and by **Goldman Theatres**, **supra**, regardless of the truthfulness of her speech). Accordingly, we direct the trial court to strike said language from the Injunction Orders.

As to the remaining portion of the Injunction Orders, which pertains to the expungement of defamatory language and the amendment of the previously filed Form U5s and IAPD, Appellants have failed to convince us that such injunctive relief constitutes a 'prior restraint' as prohibited by Article I, Section 7, **Willing**, and **Goldman Theatres**.  A 'prior restraint' involves an order forbidding **future** communications.  **See Alexander v. U.S.**, 509 U.S. 544, 550 (1993) (explaining that the term 'prior restraint' is used "to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur").  In fact, the term 'prior restraint' in and of itself implies a restraint imposed on communications **prior to** or **before** the communications occur.  As noted by the trial court, in **Willing**, the injunction orders were found to violate Pennsylvania's prohibition on prior restraints "because the orders precluded Ms. Willing from speaking her opinion freely **in the future**."  TCO at 8 (citing **Willing**, 393 A.2d at 1157-58 (emphasis added)).  Moreover, the cases cited by Appellants in support of their argument similarly involve the overturning of orders that restricted an individual's right to freely communicate their thoughts and feelings **in the future**.[16]

_____

[16] **See, e.g.**, **Organization for a Better Austin v. Keefe**, 402 U.S. 415, 418-19 (1971) (holding that a state court's injunction prohibiting the distribution of leaflets critical of the respondent's real estate practices was an unconstitutional prior restraint on speech, while noting that the injunction operated "**not to redress** alleged private wrongs, **but to suppress** … distribution of literature …") (emphasis added); **Franklin Chalfont**, 573 A.2d
*(Footnote Continued Next Page)*

Here, the trial court ordered Appellants to expunge the defamatory language in the January 13, 2021 Form U5s and IAPD and to file neutral, amended forms, only after conducting a two-day evidentiary hearing, at which the trial court found Appellants failed to produce any evidence in support of the allegations contained in those forms. The Injunction Orders were entered on April 21, 2021, months **after** the disputed communications had taken place, and only **after** the trial court made a factual finding that Appellants filed the Form U5s and IAPD "with reckless, and potentially malicious, allegations that … had no basis in fact whatsoever." TCO at 10. **See also id.** (referring to the allegations in the forms as "improper, mischievous, unprivileged, and unjustifiable speech"). Thus, we agree with the trial court that the second portion of its Injunction Orders does no more than require Appellants to amend and update forms which precipitated the underlying action. **See Willing**, 393 A.2d at 1157-58 (recognizing that such consequences were contemplated by both Blackstone and Article I, Section

_____

at 557-58 (concluding that the injunction orders which prevented the appellants from further picketing, displaying signs, and publishing statements tending to impute the appellee's lack of skill, competence, or integrity should not have been granted as such activities "are clearly protected from prior restraint under Pennsylvania law"); **Johnson v. Pilgrim Mut. Ins. Co.**, 425 A.2d 1119, 1123 (Pa. Super. 1981) (determining that, "[h]owever noble its intended purpose," the portion of the lower court's order which enjoins the appellant from further cautioning or advising its policyholders through the use of printed flyers attached to its policies and/or sending letters were improperly issued "as that type of restraint is clearly prohibited by the Pennsylvania Constitution, Art. I, [§] 7, by **Goldman Theatres** …, and by **Willing** …"). Notably, in each of these cases, the injunction orders had no effect on the communications which had precipitated the filing of the underlying actions.

7). Hence, Appellants are due no relief on their prior restraint claim as it pertains to the remaining portion of the Injunction Orders.

Next, Appellants argue that a defamation action requires a trial before a jury of one's peers and that the two partial days of hearings held by the trial court in this matter "simply do not satisfy the constitutional requirements of a jury trial. Therefore, the [trial court's] orders plainly violate both the Pennsylvania and the federal constitutions." Appellants' Brief at 31 (citing Pa. Const. Art. I § 7 ("[A]nd in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases[.]")).[17]

We recognize that the right to a jury trial, as preserved by Article I, Section 6, extends to all causes of action that existed at the time the Pennsylvania Constitution was adopted. *Mishoe v. Erie Ins. Co.*, 824 A.2d 1153 (Pa. 2003) (citations omitted). The Pennsylvania Constitution does not prescribe, however, at what stage of an action a trial by jury, if demanded, must be had. *See Application of Smith*, 112 A.2d 625, 629 (Pa. 1955). The only purpose of Article I, Section 6 "is to secure the right of trial by jury before rights of person or property are *finally* determined." *Id.* (emphasis in original).

---

[17] As noted *supra*, the language cited by Appellants in support of their argument was found to be unconstitutional. *See* Pa. Const. Art. I, § 7, Note (citing *Armao*, *supra*). Appellants should have more appropriately cited Article I, Section 6 of the Pennsylvania Constitution, which provides for the right to a jury trial. *See* Pa. Const. Art. I, § 6 ("Trial by jury shall be as heretofore, and the right thereof remain inviolate.").

- 23 -

Given that no final determination has yet been made on the underlying causes of action in this matter, we reject Appellants' argument that the Injunction Orders have deprived them of their right to a jury trial. In reaching this conclusion, we emphasize that "[t]he purposes of a preliminary injunction are to preserve the status quo and prevent imminent and irreparable harm which might occur before the merits of the case can be heard and determined." *Soja v. Factoryville Sportsmen's Club*, 522 A.2d 1129, 1131 (Pa. Super. 1987). We agree with the trial court that it was necessary to grant injunctive relief before final disposition in this case, in order to preserve Appellees' ability to work in their chosen field. *See* TCO at 12; *see also id.* at 10-11 (enumerating the significant harms that would be endured by Appellees if the Form U5s and the IAPD are not corrected and noting that Appellants' actions have effectively black-balled Appellees from working in the financial services industry).

"The procedural steps which must be followed when a preliminary injunction is sought are enumerated in Rule 1531 of the Pennsylvania Rules of Civil Procedure. Ordinarily, a preliminary injunction may be issued only after a written notice and hearing." *Soja*, 522 A.2d at 1131 (citing Pa.R.Civ.P. 1531(a)). Moreover, as the trial court noted, Rule 1531(f) specifically outlines procedures for preliminary or special injunctions involving freedom of expression. *See* Pa.R.Civ.P. 1531(f)(1) (providing the defendant the right to demand a final hearing within three days following the issuance of a preliminary injunction involving freedom of expression). We discern that the

trial court properly entered the Injunction Orders in the instant matter following notice and an evidentiary hearing, in compliance with the Pennsylvania Rules of Civil Procedure. No final hearing was requested by Appellants.

After the award of a preliminary injunction, the case proceeds for a disposition on the merits. *Soja*, 522 A.2d at 1131. "This final determination is independent of the court's prior determination as to the plaintiff's right to preliminary relief." *Id.* Thus, we agree with the trial court that the remaining portions of the Injunctive Orders "do no more than preserve the status quo while this case proceeds to a final determination on the merits[,] which can still be determined by a jury." TCO at 12. Appellants have not been deprived of their right to a jury trial, as they still have the opportunity to fully litigate the underlying claims.

## II. Amendment of the Form U5s and the IAPD

In their second claim, Appellants aver that the trial court erred in directing them to file "neutral," amended Form U5s in accordance with Schedule A, attached to the injunction orders — and in the case of Ms. Constantakis, a neutral, amended IAPD — as the Injunction Orders improperly compel speech that is "demonstrably false." Appellants' Brief at 33, 52. Appellants acknowledge that "both FINRA and Pennsylvania law require updates to Form U5s if the forms are inaccurate or incomplete based on new information." *Id.* at 39. They argue, however, "it does not follow that a preliminary injunction mandating a plaintiff's version of disputed facts is a

- 25 -

permissible remedy." *Id.* at 40-41. Rather, Appellants suggest that the regulations require updates from their perspective, *i.e.*, what Appellants know and/or believe to be true, and not from the perspective of Appellees. *Id.* at 41. They particularly take issue with the trial court's proposed, amended language, which suggests that Appellees were "permitted to resign" rather than "terminated[,]" and that Appellees were "not under internal review for fraud or wrongful taking of property, or [for] violating investment-related statutes, regulations, rules or industry standards of conduct." *Id.* at 52-53; *see also id.* at 43 (citing N.T. Hearing, 4/9/21, at 36-37 (Mr. Bryan's testifying that he still firmly believes the Form U5s he filled out are accurate)).

Appellees counter that the injunctive relief requiring the filing of neutral, amended Form U5s and an amended IAPD is consistent with the regulatory obligations imposed upon Appellants,[18] as well as the evidence presented at trial. They contend that Appellants continue to fail in their obligation to amend the forms in light of the lower court's findings and lack of evidence to support those statements. *See* Ms. Constantakis's Brief at 33; Bryan Vescio's Brief at 27. FINRA requires firms to provide "timely, complete and accurate" information on the Form U5 and IAPD and to amend and update these forms

---

[18] Appellees note that the Pennsylvania Securities Act of 1972 (70 P.S. §1-101 *et seq.*) and the FINRA Guidelines set forth obligations of a reporting entity or supervisor concerning a Form U5 and/or IAPD. *See* Ms. Constantakis's Brief at 34 (citing 70 P.S. § 1-304(c) (requiring the prompt amendment of such forms if the information contained in the document "is or becomes inaccurate or incomplete in any material respect")) (some citations omitted).

when new information is identified. ***See*** Bryan Vescio's Brief at 23 (citations omitted). Appellees assert that amending the Form U5s to indicate they were "permitted to resign" rather than "terminated" will restore the parties to their status as it existed immediately prior to the wrongful conduct at issue. ***Id.*** at 30. Additionally, they contend that any internal review by Appellants was aimed at actions carried out solely by William Vescio, not Appellees. ***Id.*** at 31 (stating that clear evidence was provided during the evidentiary hearings to establish Appellees were not involved with the invoicing of clients).

The trial court rejected Appellants' argument that its orders requiring amendment of the Form U5s and the IAPD constitute impermissible compelled speech:

> In their post[-]hearing brief, Appellants admit that they had a regulatory duty to file the Form U5s and the IAPD in the first instance. In addition to Appellants' regulatory duty to file Form U5s in certain instances, FINRA's Form U5 Uniform Termination Notice for Securities Industry Registration General Instructions provides that "[f]irms are under a continuing to [*sic*] obligation to amend and update Section 7 (Disclosure Questions) *until final disposition*, including reportable matters that occur or became known after initial submission of [the Form U5]."[5] Just as Appellants contend they were required to file the Form U5s and the IAPD, Appellants are also required to amend and update the filings before final disposition. ***Id.***
>
> > [5] FINRA's Form U5 Uniform Termination Notice for Securities Industry Registration General Instructions, *accessible at* https://www.finra.org/sites/default/files/AppSupportDoc/p015113.pdf (emphasis added).
>
> Here, Appellants had several months to investigate the accusations contained in the Form U5s and the IAPD. Nonetheless, Appellants failed to obtain any credible evidence to support the allegations as to Ms. Constantakis and Bryan Vescio. Thus, this court's orders requiring Appellants to amend and

update the Form U5 and the IAPD after the multi-day evidentiary hearing were required by FINRA. Because this court's orders were in accordance with … FINRA's regulatory scheme, the orders do not constitute compelled speech any more than Appellants' initial filings might be considered compelled speech. Appellants cannot use the FINRA rules as both a shield and a sword. A firm's obligation to make an initial filing, and to amend and update any erroneous initial filing are equally part of FINRA's system for regulatory compliance. This court's orders merely required Appellants to complete their regulatory duties by filing the required amendments due to their lack of evidence….

TCO at 11-12 (unnecessary capitalization and footnote omitted).

Moreover, the trial court explained:

Unlike in **Willing**, the Form U5s and the IAPD do not merely exhibit Appellants' opinion regarding Bryan Vescio's and Ms. Constantakis'[s] professional integrity. In this case, Appellants' filing of the unsubstantiated Form U5s and the IAPD also impact Bryan Vescio's and Ms. Constantakis'[s] very livelihoods and their ability to work in the investment industry in any capacity.

At the hearing, it became clear to this court that, if the record is not corrected, Bryan Vescio and Ms. Constantakis will be harmed in the following unique and significant ways: (1) they cannot get on a trading platform and manage the money of their clients; (2) they cannot work in the industry for other registered investment advisory firms; and (3) they are at risk of losing the clients that they have not already lost…. Appellants' actions in this case effectively black-ball Bryan Vescio and Ms. Constantakis from working in the financial services industry in any manner.

*Id.* at 10-11.

Finally, the trial court emphasized:

[I]t does not take any restraint on freedom of expression or speech lightly. However, considering the fact that Appellants' filings were made merely to comply with Appellants' regulatory duties, and weighing this against the importance of Bryan Vescio's and Ms. Constantakis'[s] right to not be black-balled from their

profession,[19] this court could not turn its back on Bryan Vescio's and Ms. Constantakis'[s] requests for injunctive relief. *See Rosenberg v. MetLife, Inc.*, 966 N.E.2d 439, 498-500 (N.Y. 2007) (clarifying that, even under New York law where Form U5s are subject to absolute privilege, individuals are not wholly without remedy as they may commence an arbitration proceeding or court action to expunge any alleged defamatory language); *see also Stega v. New York Downtown Hosp.*, 107 N.E.3d 545, 545 (N.Y. 2018) (clarifying that even absolute privilege does not shield statements, made in an administrative proceeding, that defame a person who has no adequate recourse to challenge the accusations).

Appellants had the opportunity to present any and all evidence to support the accusations in the Form U5s and the IAPD. However, as to Bryan Vescio and Ms. Constantakis, Appellants failed to provide this court with any credible, substantive evidence that might suggest that Appellants' filings were made in good faith. Moreover, Mr. Bryan's text messages demonstrate that he was willing to amend the filings if the parties could somehow make a deal regarding VAM's clients and the client fees, which Appellants feared to lose. This fact alone suggests that Appellants' filings were made with malicious intent. In sum, without any facts to support the accusations in the Form U5s and the IAPD, this court could not in good conscience permit Appellants [to] use the filings to essentially hold Bryan Vescio's and Ms. Constantakis'[s] careers hostage while this case proceeds to a determination on the merits.

*Id.* at 14-15 (unnecessary capitalization omitted).

Accordingly, the trial court ordered Appellants to expunge the defamatory language in the January 13, 2021 Form U5s and IAPD, and to file neutral, amended forms in accordance with Schedule A, attached to its

---

[19] "[A] license to pursue a livelihood or engage in a profession … has been held to be a property right protected by Article I, Section 1 of the Pennsylvania Constitution[.]" *Pennsylvania Game Com'n v. Marich*, 666 A.2d 253, 256 (Pa. 1995) (citing *Lyness v. Commonwealth, State Bd. of Medicine*, 605 A.2d 1204, 1207 (Pa. 1992) (recognizing an individual's right to pursue a livelihood or profession as a property right protected by procedural due process)).

Injunction Orders. Pursuant to Schedule A, Appellants are to amend the Form U5s to indicate that Appellees were "permitted to resign" rather than "discharged" and to provide the following explanations for their termination. In the case of Bryan Vescio:

> New information came to light regarding the circumstances surrounding [VAM's] transition to an independent registered investment adviser while Mr. Vescio was an investment adviser representative of this firm. Upon further review, the firm did not find any violations of investment-related statutes, regulations, rules or industry standards of conduct. In addition, the firm did not find that there was any fraud or wrongful taking of property.

Appellants' Brief at Appendix C (Amended Form U5 at 1). As to Ms. Constantakis, the amended Form U5 shall indicate:

> New information came to light regarding the circumstances involving Ms. Constantakis'[s] activities. Upon further review, the firm did not find any violations of investment-related statutes, regulations, rules or industry standards of conduct. In addition, the firm did not find that there was any fraud or wrongful taking of property.

*Id.* at Appendix B (Amended Form U5 at 1). Additionally, the amended Form U5s are to reflect "No" as the answer to each of the disclosure questions in Section 7.

We agree with the trial court that Appellants are obligated to amend the Form U5s and the IAPD to reflect new developments regarding Appellees' termination. In fact, FINRA's Regulatory Notice 10-39 emphasizes the importance of amending the Form U5 to reflect accurate and complete information.

> It is imperative that firms file complete and accurate Form[ U5s] in a timely manner because the reported information is used by a

number of constituencies for a variety of reasons. For instance, FINRA uses the information to help identify and sanction individuals who violate FINRA rules and applicable federal statutes and regulations. FINRA, other self-regulatory organizations and state regulatory and licensing authorities also use the information to make informed employment decisions. Further, investors use the Form U5 information that is displayed through BrokerCheck when considering whether to do business with a registered (or formerly registered) person.

**See** *Regulatory Notice 10-39, Obligation to Provide Timely, Complete and Accurate Information on Form U5,* FINRA (Sept. 7, 2010), https://www.finra.org/rules-guidance/notices/10-39.

Instantly, the trial court made significant factual findings following an evidentiary hearing on Appellees' requests for special preliminary injunctive relief. The court determined that Appellants failed to produce any evidence in support of their allegations that Appellees violated any investment-related statutes, regulations, rules, or industry standards of conduct, and concluded that Appellants' filing of the Form U5s and the IAPD was done with reckless, and potentially malicious, intent. **See** TCO at 9-10. We believe such findings constitute "facts or circumstances" which Appellants certainly should be aware cause the forms they originally filed to be "inaccurate or incomplete." **See id.** However, we also agree with Appellants that, to the extent the amended language proposed by the trial court indicates "the firm" did not find any wrongdoing on the part of Appellees, such language should not be compelled at this juncture. **See** Appellants' Brief at 43 (citing N.T. Hearing, 4/9/21, at 36-37 (Mr. Bryan's insisting that he has not changed his mind and still firmly believes the forms are accurate)). The Form U5s and IAPD should be

- 31 -

amended, rather, to report the **trial court's** preliminary findings regarding Appellees in the pending litigation. We believe such amendments will comply with FINRA's regulations, providing the public with accurate information, while also meeting the trial court's objective of preventing Appellants from essentially holding Appellees' careers hostage while this case proceeds to a final determination on the merits. Thus, we remand for the trial court to make the appropriate changes to Schedule A.

### III. Prerequisites for Imposing a Preliminary Injunction

Initially, we note that the Injunction Orders, as amended *supra*, are mandatory preliminary injunctions, in that they command positive acts on the part of Appellants, *i.e.*, the filing of amended Form U5s and an amended IAPD, to maintain the status quo of the parties. **See Greenmoor, Inc. v. Burchick Const. Co., Inc.**, 908 A.2d 310, 312-13 (Pa. Super. 2006). "[I]n general, appellate inquiry is limited to a determination of whether an examination of the record reveals that any apparently reasonable grounds support the trial court's disposition of the preliminary injunction request." **Summit Towne Centre, Inc.**, 828 A.2d at 1001 (internal quotation marks and citation omitted). The standard of review differs, however, where the trial court has granted a mandatory preliminary injunction. **See id.** at 1001 n.7. Such a remedy is extraordinary and should be utilized only in the rarest of cases. **See id.** at 1005 n.13.

This Court has explained:

Generally, preliminary injunctions are preventive in nature and are designed to maintain the status quo until the rights of the parties are finally determined. There is, however, a distinction between mandatory injunctions, which command the performance of some positive act to preserve the status quo, and prohibitory injunctions, which enjoin the doing of an act that will change the status quo. This Court has engaged in greater scrutiny of mandatory injunctions and has often stated that they should be issued more sparingly than injunctions that are merely prohibitory. Thus, in reviewing the grant of a mandatory injunction, we have insisted that a clear right to relief in the plaintiff be established.

As the above elucidates, in reviewing the grant of a mandatory preliminary injunction, we must examine the merits of the controversy and ensure that "a clear right to relief in the plaintiff is established."

*Greenmoor, Inc.*, 908 A.2d at 313 (quoting *Mazzie v. Commonwealth*, 432 A.2d 985, 988 (Pa. 1981)). Moreover, "[t]o establish a clear right to relief, the party seeking an injunction need not prove the merits of the underlying claim, but need only demonstrate that substantial legal questions must be resolved to determine the rights of the parties." *SEIU Healthcare Pennsylvania v. Commonwealth*, 104 A.3d 495, 591 (Pa. 2014). *See also Ambrogi v. Reber*, 932 A.2d 969, 980 (Pa. Super. 2007) ("For a right to be 'clear,' it must be more than merely 'viable' or 'plausible.' However, this requirement is not the equivalent of stating that no factual disputes exist between the parties.") (citations omitted); *Fischer v. Department of Public Welfare*, 439 A.2d 1172, 1174 (Pa. 1982) (explaining that "since a preliminary injunction is designed to preserve the status quo pending final resolution of the underlying issues, it is obvious that the 'clear right'

requirement is not intended to mandate that one seeking a preliminary injunction establish his or her claim absolutely").

The law of this Commonwealth requires that a petitioner seeking a preliminary injunction must establish every one of the following prerequisites:

> The party must show: 1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; 2) that greater injury would result from refusing an injunction than from granting it, and concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings; 3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; 4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits; 5) that the injunction it seeks is reasonably suited to abate the offending activity; and 6) that a preliminary injunction will not adversely affect the public interest.

*Warehime v. Warehime*, 860 A.2d 41, 46-47 (Pa. 2004) (citing *Summit Towne Centre, Inc.*, 828 A.2d at 1002 (internal citations and quotation marks omitted)). The burden is on the party who requested injunctive relief. *Id.* at 47. If the petitioner fails to establish any one of the aforementioned prerequisites, a reviewing court need not address the others. *Greenmoor, Inc.*, 908 A.2d at 313-14.

Here, Appellants maintain the trial court erred in its determination that Appellees established each of the foregoing elements in connection with their requests for special injunctive relief. We begin our analysis with the fourth prerequisite, *i.e.*, that the petitioner must show the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest,

or, in other words, that it is likely to prevail on the merits, *see Warehime*, 860 A.2d at 46-47, because our discussion of that element impacts our discussion of the other five requirements. Appellants assert that Appellees' right to relief "is far from clear," and that Appellees are not likely to succeed on the merits. Appellants' Brief at 54, 56-62. Thus, we must determine whether Appellees produced substantial, credible evidence in support of their claims. *See Kessler v. Broder*, 851 A.2d 944, 948 (Pa. Super. 2004).

To prevail on the merits of a defamation claim, the plaintiff must prove: (1) the defamatory character of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa.C.S. § 8343(a). When the issue is properly raised, the defendant has the burden of proving: (1) the truth of the defamatory communication; (2) the privileged character of the occasion on which it was published; and (3) the character of the subject matter of defamatory comment as of public concern. 42 Pa.C.S. § 8343(b).

Instantly, the content of the statements made by Appellants on the publicly available Form U5s and the IAPD is not contested, nor is the applicability of those statements to Appellees. As to the defamatory nature of these statements, we discern from the record that Appellees have produced

sufficient credible evidence to establish the defamatory character of said communications. It is well-established that:

> A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. A communication is also defamatory if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession. If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial; however, if there is an innocent interpretation and an alternate defamatory interpretation, the issue must proceed to the jury.

***Krajewski v. Gusoff***, 53 A.3d 793, 802-03 (Pa. Super. 2012) (quoting ***Maier v. Maretti***, 671 A.2d 701 (Pa. Super. 1995)). "[W]hen determining whether a communication is defamatory, the court will consider what effect the statement would have on the minds of the average persons among whom the statement would circulate." ***Id.*** at 803. Notably, communications which merely "annoy or embarrass" an individual are not sufficient as a matter of law to create an action in defamation. ***Maier***, 671 A.2d at 704.

Furthermore, "the nature of the audience hearing the remarks is a critical factor in determining whether the communication is defamatory." ***Id.*** (citing ***Gordon v. Lancaster Osteopathic Hospital Ass'n***, 489 A.2d 1364 (Pa. Super. 1985) (noting that the court must consider the expertise and knowledge of those to whom the publication is circulated and consider the effect it is fairly calculated to produce)). ***See id.*** (citing ***Rybas v. Wapner***, 457 A.2d 108, 111 (Pa. Super. 1983) (concluding that since the statement

was made only to a fellow attorney, the intended publication was extremely limited and, thus, it would not harm the reputation of the plaintiff in the community); **Agriss v. Roadway Express, Inc.**, 483 A.2d 456, 462 (Pa. Super. 1984) (determining a statement published to an employee's supervisors and co-workers concerning the employee's opening of company mail was defamatory because public contempt and ridicule was clear)).

Appellees testified at length during the preliminary injunction hearing regarding their roles at VAM, the validity of the allegations made against them by Appellants, and the detrimental effect that the Form U5 and IAPD statements have had on their careers.[20]  Appellees' testimony supports the trial court's finding that there was no factual basis for the wrongdoings alleged by Appellants in the published forms.  For instance, Bryan Vescio demonstrated that he had no involvement in creating or sending invoices to clients.  **See** N.T. Hearing, 4/6/21, at 107 (Bryan Vescio's testifying that he never saw the invoices at any point and that he had no authority to create or send invoices to clients).  Likewise, Ms. Constantakis established that she never created, sent, or collected invoices in the name of VAM.  **See id.** at 128 (Ms. Constantakis's stating that she was not involved with the invoicing

---

[20] The trial court found Appellees' testimony credible.  **See C.H.L. v. W.D.L.**, 214 A.3d 1272, 1276 (Pa. Super. 2019) ("[T]he credibility of witnesses and the weight to be accorded to their testimony is within the exclusive province of the trial court as the fact finder."); **Samuel-Bassett v. Kia Motors America, Inc.**, 34 A.3d 1, 32 (Pa. 2011) ("Where … the evidentiary record supports the trial court's credibility determinations, we are bound to accept them.").

process at all, other than checking the accuracy of numbers); *Id.* at 95-97, 100 (William Vescio's confirming that Ms. Constantakis had no direct involvement in billing customers, that Mr. Vescio always prepared the invoices, and that he even mailed them himself).

Conversely, Appellants have failed to meet their burden of proving the truth of the challenged statements. *See* 42 Pa.C.S. § 8343(b)(1). As the trial court stated,

> Appellants had a full, multi-day evidentiary hearing before adjudication of the request for immediate relief. At this hearing, Appellants had the opportunity to present relevant evidence, testimony, and perform cross-examination. Nevertheless, Appellants failed to produce any credible, substantive evidence that Ms. Constantakis or Bryan Vescio violated any investment-related statutes, regulations, rules, and industry standards of conduct. Appellants also failed to present any evidence that Ms. Constantakis or Bryan Vescio violated their fiduciary duties with intent to defraud clients by sending client invoices and requesting that funds be paid to an unlicensed and unregistered advisor entity. In fact, Appellants presented no evidence that Bryan Vescio or Ms. Constantakis ever did anything with the invoices at all.

TCO at 18. We further observe that Appellants' brief contains only bald denials of the falsity and defamatory character of the challenged statements.

Additionally, Appellees demonstrated that their professional reputations have been damaged and that Appellants' statements have negatively affected their ability to properly conduct business. *See* N.T. Hearing, 4/6/21, at 146-51 (Ms. Constantakis's recounting her damaged reputation with wholesalers and clients, her inability to secure a relationship with a custodian and/or to service clients, and her client's waning comfort level as a result); *Id.* at 109-

11 (Bryan Vescio's describing the "extremely damaging" impact that the Form U5 has had on his career, *i.e.*, his inability to work in the industry and/or to service existing clients, and the negative impact it has had on current client relationships, as well as building relationships with potential future clients).

Moreover, due to the purpose of the Form U5 and IAPD and the forms' accessibility by the public, statements contained therein are certainly wide-reaching. **See** FINRA Regulatory Notice 10-39, **supra** (acknowledging that the information contained in a Form U5 is utilized by state regulatory and licensing authorities to make informed registration and licensing decisions, by firms to help them make informed employment decisions, and by investors when considering whether to do business with a registered person). Hence, allegations of SEC violations, wrongful taking of property, and intent to defraud clients would undoubtedly damage Appellees' professional reputations and adversely affect their ability to conduct business in the financial services industry. We agree with the trial court that as a result of Appellants' defamatory statements, "Ms. Constantakis and Bryan Vescio continue to experience ongoing harm, including but not limited to, loss of clients, loss of business opportunity, reputational harm, and loss of customer goodwill." TCO at 19.

Lastly, in determining whether Appellees have established a clear right to relief regarding their defamation claims against Appellants, we consider the privileged nature of Appellants' statements and whether such privilege has been abused. By way of background, "a publisher of defamatory matter is not

liable if the publication was made subject to a privilege, and the privilege was not abused.  Communications made on a proper occasion, from a proper motive, in a proper manner, and based upon reasonable cause are privileged." ***Elia v. Erie Ins. Exchange***, 634 A.2d 657, 661 (Pa. Super. 1993) (internal citations and quotation marks omitted).  "Depending upon the importance of the publisher's actions to society, the privilege may be absolute or conditional/qualified." ***Id.*  *Compare Baird v. Dun & Bradstreet, Inc.***, 285 A.2d 166 (Pa. 1971) (finding credit reports conditionally privileged since a credit reporting agency is in the business of reporting financial information to subscribers who request such service), ***with Paintz v. Behrend***, 632 A.2d 562 (Pa. Super. 1993) (recognizing an absolute privilege for judges, lawyers, litigants, and witnesses regarding statements made during legal actions).  We observe that Pennsylvania case law reflects a narrow scope intended for the grant of an absolute privilege.  ***See Miketic v. Baron***, 675 A.2d 324, 329 (Pa. Super. 1996) (citations omitted).[21]

---

[21] The Pennsylvania Supreme Court explained the reasons for the absolute privilege:

> A judge must be free to administer the law without fear of consequences.  This independence would be impaired were he to be in daily apprehension of defamation suits.  The privilege is also extended to parties to afford freedom of access to the courts, to witnesses to encourage their complete and unintimidated testimony in court, and to counsel to enable him to best represent his client's interests.

***Id.*** at 328 (citing ***Binder v. Triangle Publications, Inc.***, 275 A.2d 53, 56 (Pa. 1971) (some citations omitted)).

In **Miketic**, this Court examined a series of Pennsylvania cases in which a conditional privilege was found to apply and recognized:

> "An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know." **Rankin v. Phillippe**, … 211 A.2d 56, 58 ([Pa. Super.] 1965) [(]quoting[] Restatement of Torts § 596 (1939)[)].

> Thus, proper occasions giving rise to a conditional privilege exist when (1) some interest of the person who publishes defamatory matter is involved; (2) some interest of the person to whom the matter is published or some other third person is involved; or (3) a recognized interest of the public is involved.

**Miketic**, 675 A.2d at 329 (some citations omitted). Moreover, we have determined:

> Once a conditional privilege applies, a plaintiff's defamation cause of action can survive only if the privilege was abused.

>> Abuse of a conditional privilege is indicated when the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or included defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.

**Foster v. UPMC South Side Hosp.**, 2 A.3d 655, 665 (Pa. Super. 2010) (internal citations omitted).

It is not settled under Pennsylvania law whether statements made in a Form U5 are subject to a conditional or absolute privilege. Instantly, while acknowledging the majority view in other states is to afford such statements

a conditional privilege,[22] Appellants suggest that an absolute privilege should be applied in this case. Appellants' Brief at 56 (citing **Merkam v. Wachovia Corp.**, 2008 WL 2214649 at *6 (Pa. Com. Pl. Phila. Cty. April 8, 2008)). As Appellees point out, however, **Merkam** applies New York law and is not binding on this Court. **See** Ms. Constantakis's Brief at 44; Bryan Vescio's Brief at 35; **see also Branham v. Rohm and Haas Co.**, 19 A.3d 1094, 1103 (Pa. Super. 2011) (stating "common pleas court decisions are not binding on appellate courts") (citation omitted). Appellants have failed to provide any other Pennsylvania case law to support their claim of absolute privilege. **See** 42 Pa.C.S. § 8343(b)(2) (providing the defendant has the burden of proving, when properly raised, that the statements were privileged). Given the narrow scope generally prescribed for an absolute privilege in this Commonwealth and Appellants' lack of relevant authority, we are unconvinced by their argument. **See Miketic**, 675 A.2d at 329.

Appellees, on the other hand, argue that the Form U5 statements are subject to a conditional privilege, which can be overcome by a showing that the statement was made with malice or negligence. In support of their position, they cite **Preston v. Fid. Brokerage Servs.**, 2020 WL 822134

---

[22] **See** Bryan Vescio's Brief at 36 n.11 (citing numerous cases reflecting that the majority of jurisdictions that have considered this issue applied a conditional privilege to Form U5 statements).

(W.D. Pa. Feb. 19, 2020).[23] In **Preston**, the plaintiff alleged that his employer engaged in a scheme to unlawfully terminate him because of his age by falsely accusing him of professional wrongdoing, and then published defamatory statements on a Form U5 as to why he was terminated. **Id.** at *1. Similar to the matter presently before us, the employer in **Preston** argued that an absolute privilege should apply to statements made in a Form U5, citing **Merkam** and relying solely on New York case law, while the plaintiff argued that Pennsylvania case law supports the majority view of affording conditional privilege for FINRA Form U5 disclosures. **Id.** at *10. The plaintiff persuasively argued that the Pennsylvania Constitution protects an individual's right to reputation, and that pursuant to defamation case law in Pennsylvania, Pennsylvania courts would not apply absolute privilege to Form U5 disclosures. **Id.** (citing Pa. Const. Art. I, § 1 (naming the protection of an individual's reputation as an inherent and indefeasible right)).

In the circumstances of conditional privilege, the parties differed as to whether malice or negligence is required to overcome such a privilege;[24]

_____

[23] "While we recognize that federal district court cases are not binding on this [C]ourt, Pennsylvania appellate courts may utilize the analysis in those cases to the extent we find them persuasive." **Umbelina v. Adams**, 34 A.3d 151, 159 n.2 (Pa. Super. 2011) (citations omitted).

[24] The plaintiff argued that Pennsylvania would permit a showing of negligence to overcome the conditional privilege in **Preston**. **Id.** (citing **Menkowitz v. Peerless Publications, Inc.**, 211 A.3d 797, 806 (Pa. 2019) (quoting **American Future Systems, Inc. v. Better Business Bureau of Eastern Pennsylvania**, 923 A.2d 389, 400 (Pa. 2007)) ("In general, in Pennsylvania,
*(Footnote Continued Next Page)*

however, they agreed that the majority view requires a showing of malice to defeat a conditional privilege for a Form U5 disclosure. *Id.* at *11.

The *Preston* Court deemed there was sufficient evidence to establish that the employer's Form U5 statements were "sound and reasonable" and concluded that the plaintiff failed to produce any contrary evidence to demonstrate a question of material fact regarding negligence on the part of the employer to defeat conditional privilege. *Id.* For the purpose of its analysis, it considered the lowest standard for privilege – conditional privilege to be defeated by negligence – and determined that the employer's conduct "qualified for conditional privilege to preclude the plaintiff's defamation claim." *Id.* Accordingly, the *Preston* Court granted the employer's motion for summary judgment on the defamation claim arising from the Form U5 filing. *Id.* at *12. Notably, the applicable standard for overcoming privilege under these circumstances was left unresolved by *Preston*, as the *Preston* Court merely stated "regardless of whether conditional privilege can be defeated by negligence or malice," the plaintiff failed to establish even the lowest standard of negligence. *Id.*

Although there remains uncertainty as to the level of privilege that should be granted to Form U5 statements, we conclude Appellees have

---

for a private figure defamation plaintiff to establish a defamation claim, the plaintiff must prove that the defamatory matter was negligently published to overcome [the] defendant's conditional privilege."). The employer argued that, "where the defamatory statements are made on the required FINRA Form U5, Pennsylvania would require plaintiff to demonstrate malice in order to overcome the conditional privilege." *Id.*

established a likelihood that the trial court in this matter would apply a conditional rather than absolute privilege. We further believe that Appellees have produced sufficient evidence to overcome the conditional privilege by a showing of negligence on the part of Appellants.[25] "[T]he appropriate standard of fault depends on whether the plaintiff is a public or private figure." *American Future Systems*, 923 A.2d at 400 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)).[26] As Appellees are clearly private figures, the standard of negligence would most likely be applied. However, we need not make a definitive determination as to the applicable standard to overcome Appellants' conditionally privileged statements at this juncture, as this constitutes a substantial legal question which must be resolved in order to determine the parties' rights. *See SEIU Healthcare Pennsylvania*, 104 A.3d at 591 ("To establish a clear right to relief, the party seeking an injunction need not prove the merits of the underlying claim, but need only demonstrate

_____

[25] The trial court found Appellants filed the Form U5s and the IAPD "with reckless, and potentially malicious, allegations[,]" which is a higher threshold to overcome than negligence.

[26] *See id.* (explaining that if the plaintiff is a public official or public figure and the statement relates to a matter of public concern, the plaintiff must establish that the defendant made a false and defamatory statement with actual malice, whereas a private figure defamation plaintiff must prove that the defamatory matter was published with "want of reasonable care and diligence to ascertain the truth" or, more simply, "with negligence"); *see also id.* at 399 (noting that the courts' previous focus on whether the speech is of public or private concern has been replaced by an inquiry into whether the plaintiff is a public or private figure for the purpose of determining the appropriate standard of fault).

that substantial legal questions must be resolved to determine the rights of the parties."); ***Agriss v. Roadway Exp., Inc.***, 483 A.2d 456, 463 (Pa. Super. 1984) ("It is a question of law whether privilege applies in a given case, but a question of fact for the jury whether a privilege has been abused."). Based on the foregoing, we conclude that Appellees have established a clear right to relief on their defamation claims.[27]

We now consider the first prerequisite to the issuance of a preliminary injunction, *i.e.*, whether the injunction is necessary to prevent immediate and

---

[27] Accordingly, we need not address whether Appellees' right to relief is clear on their other claims. Nevertheless, we note that the trial court found Appellees would also likely proceed on their tortious interference claims. ***See*** TCO at 19 (citing ***Strickland v. University of Scranton***, 700 A.2d 979, 985 (Pa. Super. 1997) (indicating that to prevail on the merits for a tortious interference claim, a party must prove there was: (1) the existence of a contractual relation between the complainant and a third party; (2) the purposeful action on the part of the defendant, specifically intended to harm the existing relation; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct)). The trial court stated:

> For the same reasons articulated with regard to the claim for defamation, this court determined Appellants acted recklessly, and perhaps maliciously, by filing the Form U5s and the IAPD without any evidence to support the accusations therein. Therefore, Appellants cannot claim the protection of any conditional privilege. Furthermore, these statements intentionally caused damage to Ms. Constantakis['s] and Bryan Vescio's livelihoods by interfering with their ability to fulfill their contractual and fiduciary duties to existing clients. Accordingly, this court determined that Ms. Constantakis and Bryan Vescio are also likely to succeed on their claims for tortious interference.

***Id.*** We would conclude there is sufficient evidence in the record to support the trial court's determination.

irreparable harm that cannot be adequately compensated by damages. Appellants challenge the trial court's determination that this prerequisite has been satisfied, arguing that Appellees' alleged harm can be adequately compensated by money damages. Appellants' Brief at 65. They further contend that Appellees remain licensed to act as investment advisers and, thus, have not suffered irreparable harm. **Id.** at 65-66 (noting that VAM obtained its RIA after the filing of the Form U5s and remains an RIA). We find this argument unconvincing.

"An injury is regarded as 'irreparable' if it will cause damage which can be estimated only by conjecture and not by accurate pecuniary standard." **West Penn Specialty MSO, Inc. v. Nolan**, 737 A.2d 295, 299 (Pa. Super. 1999) (citation omitted); **see also id.** (explaining that "the unbridled threat" of the continuation of the challenged action and "incumbent disruption of … customer relationships" establishes the existence of irreparable harm). Pennsylvania courts have consistently maintained that the disruption of business relationships and the "impending loss of a business opportunity or market advantage may be aptly characterized as an 'irreparable injury' for … the purpose of a preliminary injunction." **The York Group, Inc. v. Yorktowne Caskets, Inc.**, 924 A.2d 1234, 1242-43 (Pa. Super. 2007) (quoting **Kessler v. Broder**, 851 A.2d 944, 951 (Pa. Super. 2004)).

Instantly, the trial court found the preliminary injunctions necessary to prevent immediate and irreparable harm, "as every day the defamatory Form U5s and IAPD remain in place, Bryan Vescio and Ms. Constantakis stand to

- 47 -

lose clients, business opportunities, and customer goodwill." TCO at 16. The court added, "[t]he extent of [their] lost business opportunity can be estimated only by conjecture." *Id.* Upon review, we conclude that the record contains substantial evidence to support the trial court's finding that this element has been met.

At the evidentiary hearing, William Vescio, owner and President of VAM, testified that the consequences of Appellants' filing of the Form U5s have been "devastating" and have stopped him from earning a livelihood. N.T. Hearing, 4/6/21, at 50. He explained:

> Our business is completely shut down. We have no revenues, we can't see our clients' accounts, municipal accounts. We can't make trades in them and we need to make trades. These are important accounts because they are public funds. We can't get on any investment platforms even though we are RIA approved, RIA now. They won't allow us until the U5s are changed. We can't even affiliate with another new RIA now to get on other platforms because of the U5s. It basically stops us from doing any business.

*Id.* Additionally, he stated that he lost one of his largest and oldest clients and that multiple other clients have expressed concern over the pending litigation and, therefore, were exploring the option of taking their business elsewhere. *Id.*

Likewise, Bryan Vescio testified that the effects of the Form U5s have been "extremely damaging" to his career. *Id.* at 109. He stated that he is unable to control his client's assets because VAM cannot land a securities platform, and he fears that he will be unemployable in the industry as long as the Form U5s remain unchanged. *Id.* He explained that Form U5s become

part of an employee's public, permanent record, and that an IAR with a record indicating such allegations as made against him by Appellants would be seen as a liability to another RIA. *Id.* at 109-10.

Ms. Constantakis also provided testimony at the evidentiary hearings regarding the impact Appellants' statements have had on her, professionally. She stated that the Form U5 and IAPD have damaged her reputation with wholesalers and clients and that she has been unable to secure a relationship with a custodian to service her clients. *Id.* at 146. She has been turned down by prior colleagues and two potential employers expressly because of the Form U5. *Id.* at 146-47. She also explained that as time goes by, the damage only grows, because the comfort level of existing clients wanes. *Id.* at 150. Notably, the testimonial evidence produced by Appellees is consistent with the purpose of the Form U5, as recognized by FINRA. *See* FINRA Regulatory Notice 10-39, *supra* (noting that the Form U5 is used by "FINRA, other self-regulatory organizations and state regulatory and licensing authorities … to make informed registration and licensing decisions," by firms "to help them make informed employment decisions," and by investors "when considering whether to do business with a registered (or formerly registered) person").

We believe that the unbridled threat to Appellees' careers in the financial industry caused by the existence of the Form U5s and the IAPD, which contain damaging allegations found at this juncture to have no basis in fact, as well as the incumbent disruption of Appellees' business relationships constitute irreparable harm, necessitating preliminary injunctive relief. *See Nolan*, 737

A.2d at 299 (citing **New Castle Orthopedic Associates v. Burns**, 392 A.2d 1383, 1386 (Pa. 1978) (determining that grounds for an injunction are established where the plaintiff's proof of injury "foreshadows the disruption of established business relations which would result in incalculable damage" should the disruption continue)); **see also John G. Bryant Co., Inc. v. Sling Testing and Repair, Inc.**, 369 A.2d 1164, 1167 (Pa. 1977) (affirming the granting of a preliminary injunction to enforce a restrictive covenant in an employment agreement and explaining that "the possible consequences of [the] unwarranted interference with customer relationships … is unascertainable and not capable of being fully compensated by money damages"); **Nolan**, 737 A.2d at 299 (explaining that the disruption of established business relations "may manifest itself in a loss of new business not subject to documentation, the quantity and quality of which are 'inherently unascertainable'") (citation omitted).

Next, Appellants contend the second and sixth prerequisites have not been satisfied. **See Warehime**, 860 A.2d at 46-47 (requiring as the second prerequisite that a party show "greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings[,]" and to demonstrate that "a preliminary injunction will not adversely affect the public interest[,]" as the sixth prerequisite).

Regarding the second element, Appellants claim that granting the injunctions would substantially cause harm to them, because the Injunction

Orders intrude on their First Amendment rights. Appellants' Brief at 62 (citing

***Elrod v. Burns***, 427 U.S. 347, 373-74 (1976) (providing that the loss of First

Amendment freedoms constitutes irreparable injury)). Given our disposition

regarding the constitutionality of the Injunction Orders and the striking of the

prior restraint language, this claim has been rendered moot. ***See Orfield v.***

***Weindel***, 52 A.3d 275, 277 (Pa. Super. 2012) ("Our Courts cannot decide

moot or abstract questions….") (citation omitted). Nevertheless, we would

agree with the trial court that greater injury would result here from refusing

the injunction rather than granting it, because Appellees' livelihoods are at

stake. As the trial court explained,

> Ms. Constantakis and Bryan Vescio are incapable of earning
> employment or income in their chosen profession solely because
> of the language included in the Form U5s and the IAPD. The
> unsubstantiated accusations of securities violations, fraud, and
> breach of fiduciary duty to clients effectively black-ball Ms.
> Constantakis and Bryan Vescio from working in the financial
> services industry.

TCO at 16. On the other hand, there is no risk of harm to Appellants or other

interested parties in granting the injunctions. As amended *supra*, the

Injunction Orders merely require Appellants to update the forms to reflect the

trial court's findings and to inform the public of the pending litigation arising

from Appellees' termination. The trial court acknowledged:

> [I]t agrees with Appellants' contention that, if Form U5s or an
> IAPD were subject to improper amendment, there could be a risk
> of harm to the public in that regulators and the public are not on
> notice of potential misconduct[;] however, in this case, because
> Appellants' accusations against Ms. Constantakis and Bryan
> Vescio were made recklessly and without any basis in fact, there

> is no risk of harm to the public or to existing or potential clients of VAM or BAS.

*Id.* at 16-17. Thus, we would agree with the trial court that the second prerequisite is satisfied.

As to the sixth factor, Appellants suggest the Injunction Orders are "adverse to the public interest" because they undermine the system in place to protect the public from unscrupulous actors in the securities industry. Appellants' Brief at 63. We reject this argument. Indeed, "[t]he rules of FINRA 'are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and, in general, to protect investors and the public interest.'" *Preston*, 2020 WL 822134 at *4 (quoting 15 U.S.C. § 78o-3(b)). However, in this instance, it is "Appellants' unsubstantiated accusations in the Form U5s and the IAPD [that] ultimately mislead the public and prevent Ms. Constantakis and Bryan Vescio from conducting business and from making a living." TCO at 20. Hence, we agree with the trial court's conclusion that "precluding Appellants from black-balling Bryan Vescio and Ms. Constantakis with the unsubstantiated Form U5 and IAPD disclosures will not adversely affect the public interest." *Id.* (citing *Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Management Ltd.*, 456 Fed. Appx. 184, 189 (3d. Cir. 2012) (holding that preventing companies from interfering with another's existing or prospective business relations, especially when such interference involves defamation, furthers the public interest)). Moreover, we note that Appellants are entitled to further update the forms in the event of any future developments in the pending litigation.

Finally, Appellants allege that Appellees have failed to establish the third and fifth prerequisites for imposition of a preliminary injunction. They claim that the Injunction Orders will not properly restore the parties to their status quo prior to the alleged wrongful conduct, nor are they reasonably suited to abate the offending activity. Appellants' Brief at 70. These claims are also meritless.

In support of its finding that the third prerequisite has been satisfied, *i.e.*, the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the wrongful conduct, the trial court opined:

> "The status quo to be maintained by a preliminary injunction is the last actual, peaceable and lawful noncontested status which proceeded the pending controversy." ***Allegheny Anesthesiology Associates, Inc. v. Allegheny General Hosp.***, 826 A.2d 886, 894 (Pa. Super. 2003) (citation omitted). This court's order[s] provide[] Ms. Constantakis and Bryan Vescio with the opportunity to continue to work in the financial services industry, as they did prior to the filing of the unsubstantiated statements in the Form U5s and the IAPD.

TCO at 17. We agree.

With respect to the fifth prerequisite, *i.e.*, whether the injunction is reasonably suited to abate the offending activity, Appellants aver that the Injunction Orders are "overly broad" and "outright unconstitutional." Appellants' Brief at 70. Having already stricken the language enjoining Appellants from exercising their freedom of speech and having declared the remaining portion of the Injunction Orders constitutional as amended, *supra*, we need only address Appellants' broadness challenge. The Injunction Orders merely require Appellants to amend the Form U5s and the IAPD to reflect the

trial court's findings. "Because Appellants presented no evidence that Ms. Constantakis or Bryan Vescio actually participated in any nefarious conduct, or that Appellants had any legitimate reason to believe this might have been the case, [the trial] court determined that an injunction is reasonably suited to abate the offending activity." TCO at 20. Given the lack of evidence produced by Appellants, we agree.

In sum, we conclude that all six prerequisites for the imposition of preliminary injunctions have been satisfied.

Accordingly, we vacate the portion of the Injunction Orders that enjoin Appellants from "making false, unsubstantiated, and defamatory statements" about Appellees. We affirm the remaining portion of the Injunction Orders and remand with instructions for the trial court to amend Schedule A in accordance with this opinion.

Vacated in part. Affirmed in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/5/2022

- 54 -