J-A03027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PROPERTY DAMAGE RESTORATION 2, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KD DISASTER CLEANUP, LLC, KEVIN J. JONES, AND DEENA JONES, AND DANIELLE HAGERTY MORTIMER AND RESTORE MORE RESTORATION, LLC | : | No. 1656 EDA 2024 |
| | : | |
| APPEAL OF: DANIELLE HAGERTY MORTIMER AND RESTORE MORE RESTORATION, LLC | : | |

Appeal from the Order Entered May 29, 2024
In the Court of Common Pleas of Delaware County Civil Division at
No(s): CV-2024-001707

BEFORE: STABILE, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED MAY 14, 2025**

Danielle Hagerty Mortimer and her company, Restore More Restoration, LLC ("Restore More") (collectively, "Appellants") appeal from the preliminary injunction partially enforcing a non-compete agreement and prohibiting them from competing with Property Damage Restoration 2, Inc. ("PDR 2"). Appellants argue the non-compete agreement is unenforceable due to lack of consideration; the court erred in limiting the geographical area to Delaware and Chester Counties, when the focal area of the non-compete agreement was in New Jersey; the court failed to consider the authorized operating area of

PDR 2; and PDR 2 failed to establish Appellants' activities will cause it irreparable harm. We affirm.

PDR 2 commenced this action in February 2024 by filing a civil complaint and a petition for a preliminary injunction. The complaint alleged that in late 2022, PDR 2 purchased two SERVPRO franchises from KD Disaster Cleanup, LLC ("KDD"), Kevin J. Jones, and Deena Jones. SERVPRO is a franchise business that provides "emergency water, fire, and mold remediation and cleaning services." Compl., 2/22/24, at ¶ 17. One location was known as "SERVPRO of Southern Delaware County" and the other was "SERVPRO of West Chester." *Id.* at ¶ 19. PDR 2 closed the purchase of the two SERVPRO businesses on December 30, 2022. *Id.* at ¶ 24.

The complaint alleged that PDR 2 had hired Mortimer "as the Director of Business Development, Sales and Marketing Manager/Account Executive" in exchange for her signing a non-competition agreement. *Id.* at ¶ 25. Mortimer had worked for PDR 2 for over four years. *Id.* The non-competition agreement identified Mortimer's employer as PDR 2 doing business as both "SERVPRO of Southern Delaware County & SERVPRO of West Chester," and "Property Damage Restoration, Inc., t/a SERVPRO of Woodbury/Deptford." *Id.* at Exh. 2 ("Non-Compete Agreement") at 1.

The agreement included both a "Non-disclosure Clause" and a "Non-competition Clause." The "Non-disclosure Clause" prohibited Mortimer from disclosing confidential business material, such as the records of customer accounts, or soliciting PDR 2 customers after the termination of her

employment. Compl. at ¶¶ 27-28; Non-Compete Agreement at 1-2. The "Non-competition Clause" barred Mortimer from working in Gloucester, Camden, and Burlington counties in New Jersey, and within 50 miles of those counties, following her termination from PDR 2:

A. Engage or become interested, directly or indirectly, either as an employee, officer, employer, consultant, agent, principal, partner, stockholder, Corporate officer, director in any other individual or representative capacity own, manage, operate, control, engage or participate in any business that provides damage restoration and cleaning services or is in competition with or similar in any manner whatsoever, with the business conducted by employer at the time of termination of employee's employment. **The geographical area of application of this agreement shall be in Gloucester, Camden and Burlington counties based on Employer's License agreement in the State of New Jersey and a fifty (50) mile radius thereof.** This provision does not apply to ownership of a SERVPRO franchise.

B. Solicit or accept business anywhere within a 50[-]mile radius of Employer from any present or previous customer of the company or subsidiaries; or

C. Induce or attempt to induce any such customer to reduce such customer's business with the company or its subsidiaries, by direct advertising or solicitation anywhere within a 50 mile radius of Employer or[;]

D. Disclose the names of any such customers to any other person or persons natural or corporate[;] or

E. Solicit any of the employees of the company or its subsidiaries to leave the employ of the company or its subsidiaries[;] or

F. Take any action prejudicial to the company or their business or affairs or interests.

Non-Compete Agreement at 3 (emphasis added); ***see also*** Compl. at ¶ 26.

The agreement also included provisions in which Mortimer agreed that a violation of the Agreement would cause PDR 2 irreparable harm and that the agreement's geographic scope is reasonable and required to protect PDR 2's legitimate business interest. Non-Compete Agreement at 2; *see also* Pet. for Preliminary Injunction, 2/22/24, at ¶¶ 16, 19. It also stated that any unenforceable provision would not affect the enforceability of the remaining provisions, and that, "in lieu of each such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this agreement a provision that is legal, valid and enforceable and as similar in terms to such illegal, invalid or unenforceable provision as may be possible." Non-Compete Agreement at 2. Mortimer signed the third page of the Non-Compete Agreement on January 16, 2023. Non-Compete Agreement at 3.

In February 2023, while still working for PDR 2, Mortimer opened Restore More. Compl. at ¶ 31. She resigned from PDR 2 on March 20, 2023, and, according to the complaint, began operating Restore More in competition with PDR 2. *Id.* at ¶¶ 30-31. The complaint alleged Appellants had solicited PDR 2 clients, and that because Mortimer's cell phone number had been previously listed on SERVPRO's marketing materials, Mortimer had been able to "redirect business away from PDR 2 and to" Restore More. *Id.* at ¶¶ 36-39. The complaint brought claims of breach of contract, breach of fiduciary duty of loyalty, tortious interference with prospective business relation, conversion,

and unfair competition. PDR 2 requested damages as well as preliminary and permanent injunctive relief.[1]

The court held a hearing on PDR 2's request for a preliminary injunction. The parties agreed to submit evidence through depositions and exhibits. In addition to other documents, the parties introduced the transcripts of the depositions of Mortimer and the owner of PDR 2, Scott O'Donnell.

O'Donnell testified at his deposition that the day after PDR 2 purchased the SERVPRO businesses, he presented the former KDD employees with the three-page Non-Compete Agreement. **See** PDR 2's Response to Appellants' Opposition to Petition for Preliminary Injunction, 3/25/24, Exh. 1 ("O'Donnell Dep.") at 32, 40, 57-58. O'Donnell testified that the date of closing was December 29, 2022, and that he met with the former KDD employees on the morning of December 30, 2022, and provided them with new-hire paperwork. **Id.** at 28, 32. He stated,

> I came in the morning of the 30th, I introduced myself to everyone. Some, I had met prior. And I went around and handed out new hire packets to each person and said, here you go, if you have any questions, let me know, and, you know, just had a little conversation with people to get a feel for what they did.

**Id.** at 32. O'Donnell testified that he "hired" the former KDD employees on December 30. **Id.** at 60. He said he asked them if they wanted to work for PDR 2 and instructed them to complete the new-hire paperwork. **Id.** at 63 (O'Donnell testifying, "I didn't have any employees on December 30th. I went

_____

[1] PDR 2's claims against K.D. Disaster cleanup, Kevin Jones, and Denna Jones, and Appellants' counterclaims against PDR 2, are not at issue in this appeal.

to everybody and said, do you want to join the team and handed them a package and said here, fill this out").

O'Donnell testified he could not recall whether he specifically discussed the terms of the Non-Compete Agreement with Mortimer prior to, or on, December 30. *Id.* at 39, 41, 42. He testified that he spoke with Mortimer on the night of December 29, but could not recall the exact conversation. *Id.* at 41. On the morning of December 30, he saw Mortimer, as she was getting ready to leave. O'Donnell believes he told Mortimer he was putting the new hire paperwork on her desk.

> Q. When you were handing out these packets, do you recall handing a packet to Ms. Mortimer?
>
> [O'Donnell]. I believe I told her it was on her desk.
>
> Q. So you did not hand it specifically to Ms. Mortimer; is that correct?
>
> [O'Donnell]. I don't recall[,] to be honest with you. I believe -- you know, there was several employees, so I was going around talking to everyone. It was a long time ago.

*Id.* at 37.[2]

O'Donnell testified he was "a hundred percent positive" that he provided all three pages of the Non-Compete Agreement to Mortimer on December 30. *Id.* at 64-65. O'Donnell testified that he instructed Mortimer to fill out the paperwork. *See id.* at 40 (O'Donnell testifying that on the date of closing, "[I]

---

[2] *See also* O'Donnell Dep. at 63-64 (O'Donnell testifying, "I remember seeing her in the morning and I remember – I believe what I told her was, hey, I am putting your new hire packet on your desk, because I believe she was getting ready to leave").

gave her the package just like I gave to everybody else and said, here, here is your new hire packet, **I need you to fill it out**," or, "if I didn't hand her hers, I may have said, Danielle, your new hire packet is sitting on your desk, **please fill it out**") (emphasis added).

PDR 2 introduced the 21-page new hire packet, including the Non-Compete Agreement and an "Application for Employment," that Mortimer executed on January 16, 2022. *Id.* at 69-73; Binder Exh. 9. O'Donnell testified that Mortimer never asked questions or expressed concerns about the Non-Compete Agreement. O'Donnell Dep. at 108. He stated that he never threatened Mortimer that he would not pay her for the work she already performed unless she signed the Non-Compete Agreement. *Id.* at 107.

O'Donnell testified that in February, Mortimer approached him about a new role wherein she would manage two other employees and receive additional compensation. *Id.* at 78-88. O'Donnell sent Mortimer a new employment agreement and a revised non-competition agreement in late February, which she refused to sign. *Id.* at 82; Binder Exh. 10.

O'Donnell testified that he also owns another company, Property Damage Restoration, Inc., which owns other SERVPRO franchises in New Jersey. O'Donnell Dep. at 18-27. He prepared the new hire packets for the prospective employees of SERVPRO of West Chester and SERVPRO of Southern Delaware County on his home computer using similar paperwork to the paperwork he had used for his SERVPRO franchises in New Jersey. *Id.* at 35. He acknowledged that, despite the Non-Compete Agreement's reference

to New Jersey, PDR 2 does not have a license agreement in the state of New Jersey or operate there. *Id.* at 67, 69.

Appellants asked O'Donnell to define the operating area of the two SERVPRO business owned by PDR 2, and O'Donnell responded that the "operating territory" is West Chester and Southern Delaware County. *Id.* at 53, 54. Appellants asked if the SERVPRO franchisor provides "a set of ZIP codes that set forth your operating territory," and O'Donnell responded, "They give you a geography, so sometimes ZIP codes overlap[.]" *Id.* at 55. He agreed that the operating territory provided by the SERVPRO franchisor is "abutting or next to" other SERVPRO locations. *Id.* To operate outside its given territory, a SERVPRO franchise location must request permission from the SERVPRO corporation. *Id.* at 56. When asked if PDR 2 has ever requested permission to operate outside of its normal territory, O'Donnell responded, "Not yet." *Id.*

Regarding the harm Appellants have caused to PDR 2, O'Donnell testified that (1) Restore More is a competing business, (2) Appellants have taken employees from PDR 2, (3) Mortimer receives phone calls meant for SERVPRO and persuades those customers to hire Restore More instead, and (4) Appellants use SERVPRO's prior business records to bid on jobs. O'Donnell testified,

> Well, one, she is a direct competitor. Two, she's – I thought she has been poaching our employees. She now testifies that she has no employees. But she has pictures on her website of former employees. When anyone calls her cell number which was advertised for the last five years as Servpro and asks about

Servpro, she does everything she can to persuade them not to use Servpro and to use her company. So she is also, you know -- as was stated, she's also stolen jobs from us via bids.

*Id.* at 88-89.

Regarding Appellants' use of the phone number to "poach" SERVPRO customers, O'Donnell further explained,

We had a customer that told us that they called our number and spoke to somebody who encouraged them not to use Servpro. They said it sounded like a disgruntled employee. So they called back on a different number and got our office, at which time we took the information and went out and performed the job.

*Id.* at 90-91. O'Donnell stated,

It's been one of these things like bread crumbs over time where different things have happened and here we are a year later and I am finally realizing oh, my gosh, like, yeah -- for the last five years, her cell phone number has been marketed as Servpro. So when she walked out the door, she continued to receive phone calls for Servpro.

*Id.* at 91-92. He gave, as another example, that a church pastor called SERVPRO to follow-up on the work it had done, "except we hadn't done any work, and he thought he was dealing with Servpro and he was not." *Id.* at 105. O'Donnell stated he would need to see Appellants' business records to be able to tell which of Appellants' clients were formerly PDR 2's clients. *Id.* at 92.

O'Donnell also testified that although he could not prove any former PDR 2 employees were working for Appellants, he saw a photograph of a former PDR 2 employee "wearing a Restore More t-shirt in front of a Restore More van[.]" *Id.* at 93.

O'Donnell further testified that when Mortimer resigned, she emptied her office and wiped out her computer records and took with her "confidential or proprietary materials" owned by PDR 2, including "[b]ids on jobs, our paperwork, our files." *Id.* at 96, 102. O'Donnell testified this impaired PDR 2's ability to bid on jobs for those clients. *Id.* at 96-97. For example, he stated that although SERVPRO had bid on a recurring job for West Chester University in prior years, it did not bid on the job that year because PDR 2 "didn't know about it" due to Mortimer having taken the files. *Id.* at 97.

During Mortimer's deposition, she was asked whether she had had a conversation "with Scott O'Donnell or anybody else" on or before December 30 regarding her employment with PDR 2. She testified she was told, "That it -- everything would stay the same, . . . I would continue my position as successfully [as] with Mr. Jones [and] K.D. Disaster." PDR 2's Response to Appellants' Opposition to Petition for Preliminary Injunction, Exh. 2 ("Mortimer Dep.") at 18. She stated she had not had a non-compete agreement when she worked for KDD and was not put on notice that a non-compete agreement would be required as a condition of her employment with PDR 2. *Id.* at 116.

Mortimer testified that on December 30, O'Donnell met with most of the employees, but that she only stayed for a welcome breakfast and then left. *Id.* at 14. She stated she did not recall anyone receiving any new hire paperwork. *Id.* at 14-15. She testified that she received a company credit card that morning and only signed the form regarding its use. *Id.* at 15, 38.

Mortimer testified she did not receive the Non-Compete Agreement until January 6, 2023, after she had been working for PDR 2 for over a week. *Id.* at 16. She stated she had been out of the office since December 30, working on job sites, and found the packet on her desk on January 6. *Id.* at 16-17; *see also id.* at 119-20 (Mortimer stating, "I wasn't handed the package. Everybody must have got theirs before me. I must have still been on the road. And I didn't get my packet yet. And so everybody else had it"). As proof that Mortimer had not received the Agreement earlier, Appellants introduced a copy of a text message conversation Mortimer had with the office manager on January 6, as follows:

> [Mortimer:] Any thoughts on package?
>
> [Office Manager:] Non compete. And lie detector verbiage. Weird…
>
> [Mortimer:] What
>
> [Mortimer:] I didn't read that
>
> [Mortimer:] You 2 or just me
>
> [Mortimer:] Everyone's the same
>
> [Office Manager:] Idk
>
> [Mortimer:] I feel sick
>
> [Office Manager:] It's bizarre right?! I didn't put these together. He ran all the copies and stuffed the folders so idk what everyone else got

*Id.* at 119-20; Binder Exh. 1. Mortimer testified that the copy of the non-compete agreement she found on her desk on January 6 included only the third page. Mortimer Dep. at 36, 41.

Mortimer testified that she ultimately signed the Non-Compete Agreement on January 16 because O'Donnell had threatened to withhold the pay she had earned in the period since the sale. *Id*. at 24. She stated O'Donnell told her, "I was holding up payroll, they could not process payroll until I signed that, and I would not be part of payroll." *Id.* When asked whether it was true she could not be paid because she had not signed a W-4 tax form, Mortimer stated, "Well, I had to complete the entire packet." *Id.* She acknowledged she signed all the new hire paperwork on January 16, aside from the credit card form she had previously executed. *See id.* at 26-38. The W-4 tax form Mortimer signed on January 16 indicated that her first date of employment was December 30, 2022. *Id.* at 39-40.

Mortimer asserted she told O'Donnell she "was uncomfortable signing the non-compete," but said that she signed it because it was the last day to sign her new-hire paperwork to be paid on January 19, as opposed to two weeks later. *Id.* at 25, 35, 42. Mortimer testified that she scanned a copy of the new hire packet to her e-mail using the office scanner. *Id.* at 42. She stated O'Donnell asked her what she was doing, and she told him. *Id.* Mortimer testified that she resigned in March because O'Donnell asked her to sign a new non-compete. *Id.* at 43-44.

According to Mortimer, she first bid on an annual dorm-cleaning job for West Chester University on behalf of SERVPRO, before she left PDR 2's employment, and then bid on the same job again on behalf of Restore More,

after she left PDR 2. *Id.* at 68-71. The university asked SERVPRO to enter a second bid, but ended up giving the job to Restore More. *Id.*

Mortimer stated after she left PDR 2, she received two phone calls for SERVPRO, and that she forwarded those to PDR 2. *Id.* at 73-74.

The court found O'Donnell's deposition testimony to be credible, and Mortimer's, not credible. It determined that O'Donnell had presented employment packets to all former KDD employees on December 30, 2022, as a condition for their new employment with PDR 2, and that Mortimer's execution of the Non-Compete Agreement was "a condition of . . . [her] acceptance [of] employment at PDR 2." *See* Trial Court Opinion, 8/12/24, at 3, 5, 6. It also found that Mortimer "executed the papers without protest to . . . O'Donnell." *Id.* at 6. The court rejected Mortimer's testimony that she only received a one-page document, and that she only executed the Non-Compete Agreement after O'Donnell threatened to withhold her pay. *Id.* at 3.

The court also reviewed Appellants' marketing efforts, and found the record established Appellants' communicating and conducting business with past and current SERVPRO clients was causing PDR 2 immediate and irreparable harm. *Id.* at 5-6. The court further found that PDR 2 had a legitimate interest in protecting itself from competition by Appellants. *Id.* at 4, 6. It therefore concluded that PDR 2 was likely to prevail on the merits.

The court entered a preliminary injunction prohibiting Appellants from competing with PDR 2 in Delaware County or Chester County pending trial.

*See* Order, 5/29/24, at 1-2.[3] The court surmised O'Donnell "had properly amended the first page of the PDR 2 Non-Compete Agreement to identify the new Pennsylvania SERVPRO franchises but failed to modify geographical restrictions on page three which had probably been used for the south New Jersey locations." Trial Ct. Op. at 3. The court noted that Chester County and Delaware County are within the boundary of the 50-mile radius established by the Non-Compete Agreement. *Id.* at 5. It also found these areas are where PDR 2 conducts business with the client and customer contacts it purchased from KD Disaster cleanup. *Id.* at 3. The court determined that enforcing the non-compete in these areas would abate the offending activity and restore the status quo. *Id.* at 5.[4]

Appellants appealed. Following Appellants' Second Emergency Application for Stay Pending Appeal, the court limited the preliminary injunction to the zip codes in Delaware County and Chester County where PDR 2 "is authorized to properly conduct business." *See* Order, 6/26/24, at 1.

Appellants raise the following issues.

> 1. Whether the trial court erred by issuing a preliminary injunction when PDR 2 failed to establish it is likely to prevail on the merits

---

[3] The order is dated May 28, 2024, but was filed on May 29.

[4] The court initially entered a preliminary injunction on May 10, 2024, by order dated May 8, 2024. Appellants filed a notice of appeal from that order. The May 29 preliminary injunction order then vacated the May 10 order. Appellants filed a notice of appeal from the May 29 order on June 13, 2024, resulting in the instant appeal. This Court thereafter discontinued the earlier appeal from the May 10 order. *See* Notice of Discontinuance of Action, 7/12/24, filed at No. 1365 EDA 2024.

- 14 -

since the execution of the restrictive covenant was not accompanied by adequate consideration?

2. Whether the trial court erred by issuing a preliminary injunction that rewrites material terms of the subject noncompetition agreement, including by changing the non-competition agreement's stated purpose of protecting PDR 2's interests in New Jersey to protecting PDR 2's interests in Pennsylvania?

3. Whether the trial court erred by issuing a preliminary injunction that enjoins Danielle Mortimer and Restore More Restoration LLC's activities in a geographic area outside of PDR 2's authorized operating territory?

4. Whether the trial court erred by issuing a preliminary injunction when PDR 2 failed to establish Danielle Mortimer and Restore More Restoration LLC's activities caused it or will cause it immediate and irreparable harm that cannot be adequately compensated by monetary damages?

Appellants' Br. at 8-9 (answers below and suggested answers omitted).[5]

---

[5] Where the time limitations of a restrictive covenant have expired, issues surrounding its enforcement may be moot. ***See, e.g., Commonwealth Physician Network, LLC v. Kutz***, No. 1242 MDA 2023, 2025 WL 844947, unpublished mem. at *4 (Pa.Super. filed Mar. 18, 2025); ***PeopleShare, LLC v. Vickery***, No. 476 EDA 2020, 2021 WL 1986574, unpublished mem. at *4 (Pa.Super. filed May 18, 2021). Here, however, the Non-Compete Agreement includes conflicting provisions regarding its duration. ***See*** Non-Competition Agreement at 1-2 (providing that portion of Non-disclosure Clause prohibiting Mortimer from soliciting PDR 2's customers or possessing PDR 2's customer lists is valid for three years following termination of employment), 2 (providing Agreement is effective for one year from the date of its execution, and "automatically renewed for the same term"), and 3 (providing Non-competition Clause is valid for two years following termination of employment). At the very least, it appears the three-year term of the Non-disclosure Clause has yet to expire. In addition, neither party argues that the Non-Competition Agreement has expired or that this appeal is moot. ***See Pittsburgh Logistics Sys., Inc. v. BeeMac Trucking, LLC***, 202 A.3d 801, 809 n.11 (Pa.Super. 2019) (*en banc*) (noting neither party raised issue of whether expiration of no-hire provision in contract which was subject of appeal of preliminary injunction rendered the appeal moot), *aff'd*, 249 A.3d 918 (Pa. 2021). We trust that in its final disposition of the matter, the trial court will

*(Footnote Continued Next Page)*

We review an order granting a preliminary junction for an abuse of discretion. ***CKHS, Inc. v. Prospect Med. Holdings, Inc.***, 329 A.3d 1204, 1211 (Pa. 2025). At this stage, our review is "highly deferential" to the trial court, as the law and evidence that will control the outcome of the full controversy are not yet manifest. ***Id.*** Thus, we will not resolve "the merits of the controversy," but limit our review to "examin[ing] the record to determine if there are any apparently reasonable grounds for the action of the court below." ***Id.*** (citation omitted). We will reverse only where "no grounds exist" to support the decree" or where "the rule of law relied upon was palpably erroneous or misapplied[.]" ***Id.*** (citation omitted). Our scope of review is plenary. ***Id.*** at 1211 n.2

"A preliminary injunction is a temporary remedy with the purpose to preserve the status quo as it exists or previously existed before the acts complained of, thereby preventing irreparable injury or gross injustice until the trial court can conduct further proceedings to resolve the underlying merits of the case." ***Id.*** at 1214-15 (internal quotation marks and citation omitted). The moving party bears the burden to establish "six essential prerequisites":

> (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior

_____

resolve any issues regarding the duration of the Non-Competition Agreement according to the applicable legal principles.

- 16 -

to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and, (6) the preliminary injunction will not adversely affect the public interest.

*Id.* at 1209 (quoting **SEIU Healthcare Pa. v. Commonwealth**, 104 A.3d 495, 501 (Pa. 2014)), 1215.

Appellants first argue that PDR 2 is not likely to prevail on the merits because the Non-Compete Agreement is unenforceable for want of consideration. Appellants rely on caselaw stating that when an employee signs a non-compete after the commencement of employment, and the employer does not provide adequate consideration, the agreement is unenforceable. Appellants' Br. at 36 (citing **Socko v. Mid-Atl. Sys. of CPA, Inc.**, 126 A.3d 1266, 1274-75, 1278 (Pa. 2015)) and 37-38 (citing **Rullex Co., LLC v. Tel-Stream, Inc.**, 232 A.3d 620, 627 (Pa. 2020)). According to Appellants, Mortimer began working for PDR 2 on December 30, 2022, but was not given the non-compete until January 6, 2023. Appellants assert that even if O'Donnell placed the Non-Compete Agreement on Mortimer's desk on December 30, he did not bring her attention to it, and therefore this unilateral action "cannot possibly constitute an agreement between the parties as to the restrictive covenant's substantive terms buried in the packet." *Id.* at 49. Appellants also stress that, even if O'Donnell had given Mortimer a copy of the Non-Compete Agreement on December 30, she did not execute it until January 16, 2023, after she had been working for approximately 18 days, and that she was not provided any consideration at that time. *Id.* at 48.

- 17 -

A non-competition clause of an employment contract is only enforceable if it is "(1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) the restrictions [included] are reasonably limited in duration and geographic extent; and (4) the restrictions are designed to protect the legitimate interests of the employer." *Socko*, 126 A.3d at 1274.

Regarding consideration, "[i]f a noncompetition clause is executed at the inception of the employment, the consideration to support the covenant may be the award of the position itself." *Id.* at 1275. If it is executed "after an employee has commenced his or her employment," it is only enforceable if the employee receives "new" consideration, such as a promotion or increase in compensation. *Id.* The mere continuation of employment is insufficient. *Id.*

A non-compete agreement executed after the first day of work may be enforceable, even absent fresh consideration, if it is "understood by the parties at the outset of the employment relationship as being part of their overall arrangement" and thus "ancillary to the taking of employment." *Rullex Co., LLC*, 232 A.3d at 626 (citing *Beneficial Fin. Co. of Lebanon v. Becker*, 222 A.2d 873, 876 (Pa. 1966)). Thus, there is no bright-line requirement that the employee sign the agreement on the first day of employment, so long as the agreement is "'an auxiliary part of the taking of regular employment' as opposed to 'an after-thought to impose additional restrictions on the unsuspecting employee[.]'" *Id.* (quoting *Beneficial Fin. Co. of Lebanon*, 222 A.2d at 876). Accordingly, a non-competition agreement is enforceable if

the moving party provides evidence that the parties agreed to its substantive terms at the outset of the employment relationship and incident to that relationship. *Id.* at 627, 628; *see also Beneficial Fin. Co. of Lebanon*, 222 A.2d at 876 (finding restrictive covenant enforceable where it "was prepared the day the employee commenced work, signed by the employee two days later, and accepted by the out-of-state parent corporation nine days after that").

Conversely, if an employer presents an employee with a non-competition agreement at the start of employment but does not make its execution a condition of employment, instead offering the employee a chance to change or negotiate any objectionable provisions, a late-executed agreement is unenforceable without new consideration. In such a situation, the employee does not manifest an intent to be bound by a non-competition agreement simply by commencing work. *See Rullex Co., LLC*, 232 A.3d at 627-28 (finding employee did not manifest intent to be bound by non-compete agreement where he did not execute it until at least two months after starting work and where employer's sole witness testified that when he presented the agreement to employee, he told him he should consider it and if he did not agree with any provisions, employer would change them).

Here, the court found that although Mortimer began working for PDR 2 on December 30, 2022, and did not execute the Non-Compete Agreement until January 16, 2023, O'Donnell had given Mortimer the Agreement on

December 30, 2022, and made Mortimer's execution of it a condition of her acceptance of employment at PDR 2.

This conclusion is supported by the record. PDR 2 presented evidence, by way of O'Donnell's deposition, that it did not impose the Non-Compete Agreement on Mortimer "as a belated addition to the employment relationship," but as a requirement of her employment at its inception. ***Rullex Co., LLC***, 232 A.3d at 627. O'Donnell did not testify that he gave the agreement to Mortimer with an invitation to negotiate its terms. Rather, according to O'Donnell, he gave it to Mortimer on the first morning of her employment and told her she needed her to fill it out. Mortimer complied within two weeks, and without objection. Mortimer herself acknowledged that she executed the Agreement at the same time that she executed the other new hire paperwork, including her application for employment, and that she did so within her first payroll period. On these facts, the court's conclusions that the Agreement was a condition of Mortimer's taking of employment and that she assented to its terms at the commencement of her employment are supported by the record and not based on a palpably erroneous understanding of the law. The trial court had reasonable grounds to find that PDR 2 is likely to prevail on the merits.

In their second issue, Appellants argue the Non-Compete Agreement is unenforceable because it is not designed to protect PDR 2's legitimate business interests. Appellants' Br. at 53. Appellants argue that the Non-Compete Agreement's "clear and unambiguous terms provide that the purpose

of its existence is to protect PDR 2's New Jersey license agreement, not a Pennsylvania license agreement." *Id.* at 57. Appellants claim that this is not a legitimate interest because PDR 2 does not operate in New Jersey or have a license agreement there. Appellants argue that while a court is permitted to restrict an overly broad non-compete, here, the court erred by rewriting the territory in direct contradiction with the Non-Compete Agreement's accepted and plain meaning, and "to provide protection contrary to the parties' contractually stated purpose for the agreement's existence." *Id.* at 59.

A stated above, a restrictive covenant "must be reasonably limited in . . . geographic extent" and the restrictions must be "designed to protect the legitimate interests of the employer." *Socko*, 126 A.3d at 1274. "[W]here [a restrictive] covenant imposes restrictions broader than necessary to protect the employer, . . . a court of equity may grant enforcement limited to those portions of the restrictions which are reasonably necessary for the protection of the employer." *Sidco Paper Co. v. Aaron*, 351 A.2d 250, 254 (Pa. 1976); *see also All-Pak, Inc. v. Johnston*, 694 A.2d 347, 350-51 (Pa.Super. 1997) ("[W]hen fashioning an injunction to enforce a restrictive covenant, trial courts have broad powers to modify the restrictions imposed on the former employee to include only those restrictions reasonably necessary to protect the employer"). A court may grant partial enforcement of a territorial restriction, even if the covenant does not purport to be divisible, absent additional language. *Sidco Paper Co.*, 351 A.2d at 255.

Thus, where a restrictive covenant's geographic scope is broader than the employer's legitimate business interests, the contract is not rendered unenforceable in its entirety, but subject to partial enforcement. Here, the trial court found that the Non-Compete Agreement was put in place to protect PDR 2's legitimate business interest of protecting itself from competition with Mortimer. However, it found the full geographical territory covered by the Non-Compete Agreement was not necessary to protect PDR 2's legitimate interests, because PDR 2 does not operate in New Jersey. The court therefore modified the territory covered by the Non-Compete Agreement to include only those counties in which PDR 2's SERVPRO franchises operate.

This was neither an abuse of discretion nor a palpably erroneous application of the law. The Non-competition Clause, located on the third page of the Non-Compete Agreement, states that the applicable geographic territory is Glouster, Camden, and Burlington Counties, and a 50-mile radius thereof. While it also states that this geographic area is "based on Employer's License agreement in the State of New Jersey," it does not state that the purpose of the Agreement is to protect PDR 2's license agreement. The three-page Agreement makes no other reference to any license or license agreement. Rather, the first page of the Non-Compete Agreement correctly identifies Mortimer's employer as PDR 2 d/b/a SERVPRO of Southern Delaware

County and SERVPRO of West Chester.[6] The Agreement also states that any unenforceable provisions shall be made into similar, enforceable provisions with additional language. The court limited the territorial area of the Non-Compete Agreement to only the Pennsylvania counties where PDR 2's SERVPRO franchises operate.[7] This geographic area was within the scope of the Agreement, and this remedy was contemplated by the terms of the Agreement.

In their third issue, Appellants argue that even if the law permitted the court to modify the geographical scope of the Non-Compete Agreement, the court's modification here was unreasonable because it did not consider the geographical areas in which PDR 2 is authorized to operate its SERVPRO businesses. Appellants point out that the preliminary injunction prohibits them from competing with PDR 2 in all of Chester County and Delaware County, while SERVPRO only permits PDR 2 to operate in smaller areas. Appellants' Br. at 61 (citing ***Boldt Mach. & Tools, Inc. v. Wallace***, 366 A.2d 902, 908 (Pa. 1976)).

The geographic area of a restrictive covenant should be no greater than reasonably necessary for the protection of the interest sought to be protected. ***Boldt Mach. & Tools, Inc.***, 366 A.2d at 907. The court must balance "the

---

[6] It also incorrectly identifies her employer as PDR 2's sister company which operates in New Jersey.

[7] Appellants do not contend that the Pennsylvania counties are outside the 50-mile radius around Gloucester, Camden, and Burlington Counties.

employer's protectible business interests against the interest of the employee in earning a living in his or her chosen profession, trade or occupation" and balance this result "against the interest of the public." *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 920 (Pa. 2002). Here, the trial court found that Delaware County and Chester County "is where PDR 2 was conducting business with client and customer contacts purchased from [KDD]." Trial Ct. Op. 3.

Appellants have failed to establish that the trial court erred or abused its discretion. Appellants produced no evidence that PDR 2's operating territory under the SERVPRO franchises is smaller than these two counties. While O'Donnell testified that SERVPRO gives each location a set of zip codes, Appellants did not ask him what zip codes SERVPRO gave to PDR 2.

Furthermore, the trial court has since limited the preliminary injunction to the zip codes in Delaware and Chester County where PDR 2 "is authorized to properly conduct business," pending the outcome of this appeal. *See* Order, 6/26/24, at 1. We trust the trial court's final resolution of this case will include an examination of all evidence the parties present. But at this juncture, we cannot say the court had no reasonable grounds to initially enforce the Non-Compete Agreement throughout Chester County and Delaware County.

In their final issue, Appellants argue PDR 2 did not carry its burden to establish that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by monetary damages. Appellants argue the harm here is based on speculation and has not been

proven to be irreversible. Appellants' Br. at 65. Appellants point out that PDR 2 did not seek injunctive relief until a year after Mortimer began operating Restore More. Appellants also highlight that O'Donnell testified that he discovered Restore More's operation based on "bread crumbs" of its activity. *Id.* at 64 (citing O'Donnell Dep. at 91-92). They also stress that O'Donnell testified that he did not know whether Appellants had successfully stolen any of PDR 2's clients.

A petitioner seeking a preliminary injunction needs to show proof of irreparable harm, *i.e.*, harm that cannot be assessed "by an accurate pecuniary standard." ***CKHS, Inc.***, 329 A.3d at 1215 (quoting ***Anchel v. Shea***, 762 A.2d 346, 351 (Pa.Super. 2000)). Harm is irreparable if the exact amount of damages is only able to be measured "by conjecture," and may be "monetarily small." *Id.* at 1215 (citation omitted), 1219. Irreparable harm may consist of "disruption of business relationships and the impending loss of a business opportunity or market advantage." ***Constantakis v. Bryan Advisory Servs., LLC***, 275 A.3d 998, 1028 (Pa.Super. 2022) (internal quotation marks and citation omitted). Therefore, a covenant not to compete that is reasonably designed to protect against "unwarranted interference with customer relationships" is "*prima facie* enforceable in equity." ***John G. Bryant Co. v. Sling Testing & Repair. Inc.***, 369 A.2d 1164, 1167-68 (Pa. 1977) (italics added).

O'Donnell testified that Appellants' marketing efforts and communications were interfering with PDR 2's customer and business

relationships, which the Non-Compete Agreement was reasonably designed to protect against. PDR 2 was not required to prove the harm is more than minimal, or to quantify it. The court's conclusion that there was sufficient proof of irreparable harm to grant the preliminary injunction has support in the record and is not based on a palpably erroneous understanding of the law.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/14/2025